# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 10, 2005

Decided March 25, 2005

Reissued May 9, 2005

No. 04-7051

GWENDOLYN REID, AS MOTHER AND NEXT FRIEND OF
MATHEW REID, A MINOR,
APPELLANT

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01611)

———

*Keith A. Noreika* argued the cause for appellant. With him
on the briefs were *Carolyn F. Corwin*, *Jennifer E. Schwartz,* and
*Robert I. Berlow*.

*Mary T. Connelly*, Assistant Attorney General, Office of
Attorney General for the District of Columbia, argued the cause
for appellee. With her on the brief were *Robert J. Spagnoletti*,
Attorney General, and *Edward E. Schwab*, Deputy Attorney
General.

Before: SENTELLE, HENDERSON, and TATEL, *Circuit*

*Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*:  When a school district deprives a disabled child of free appropriate public education in violation of the Individuals with Disabilities Education Act, a court fashioning "appropriate" relief, as the statute allows, may order compensatory education, i.e., replacement of educational services the child should have received in the first place.  This commonsense proposition—conceded by the school district here and supported by the Supreme Court's decision compelling reimbursement for such services in *School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985)—led a hearing officer to award appellant, a sixteen-year-old with severe learning disabilities, 810 hours of compensatory education, one hour for each day in the four-and-a-half years during which the school system denied the student appropriate instruction.  Pointing out that neither reasoning nor evidence supported this hour-per-day calculation and insisting that hour-per-hour relief was instead the child's due, the child and his mother argue that the hearing officer abused his authority.  They also challenge the officer's decision to allow the child's "individualized education program team" to reduce or discontinue compensatory services "on the decision of the IEP team that Minor no longer needs or is not benefitting from this compensatory education."  Because we agree that the hearing officer's mechanical calculation merits no deference and that the IEP team delegation violates the statute, we reverse the district court's grant of summary judgment to the school district.  We reject, however, appellants' equally mechanical hour-per-hour calculation and instead adopt a qualitative standard:  compensatory awards should aim to place

disabled children in the same position they would have occupied but for the school district's violations of IDEA.

**I.**

Under the Individuals with Disabilities Education Act (known as "IDEA"), states and territories, including the District of Columbia, that receive federal educational assistance must establish "policies and procedures to ensure," among other things, that "free appropriate public education," or "FAPE," is available to disabled children. *See* 20 U.S.C. § 1412(a)(1)(A). Premised on Congress's expectation that "[w]ith proper education services, many [disabled individuals] would be able to become productive citizens, contributing to society instead of being forced to remain burdens," S. Rep. No. 94-168, at 9 (1975) (discussing predecessor to IDEA), this requirement furthers "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities," 20 U.S.C. § 1400(c)(1). School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction. Instead, school systems must ensure that "[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." *Id.* § 1412(a)(3)(A). Once such children are identified, a "team" including the child's parents and select teachers, as well as a representative of the local educational agency with knowledge about the school's resources and curriculum, develops an "individualized education program," or "IEP," for the child. *See id.* §§ 1412(a)(4), 1414(d). Pursuant to the Supreme Court's decision in *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176 (1982), the IEP must, at a minimum, "provid[e] personalized instruction with sufficient support services to permit the child to benefit

educationally from that instruction." *See id.* at 203. In addition, "if the child is being educated in the regular classrooms of the public education system, [the IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. "If no suitable public school is available, the [school system] must pay the costs of sending the child to an appropriate private school." *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991).

In this case, as two successive administrative hearings established and as the District of Columbia, appellee herein, now concedes, the District of Columbia Public Schools ("DCPS") failed to meet its IDEA obligations with respect to appellant Mathew Reid. A sixteen-year-old District of Columbia resident, Mathew suffers from documented learning disabilities, including dyslexia and attention deficit hyperactivity disorder, that affect his short-term auditory memory, formation of grammatical sentences, and articulation of word sounds. Though Mathew's mother had noticed by the fall of her son's second-grade year that he had difficulty reading, when she contacted a school district counselor, the counselor refused to provide the necessary form for requesting a disability evaluation. The following spring, during a meeting with Mathew's teacher and school principal, the teacher recommended that Mathew be retained in second grade due to behavioral and academic problems. According to Ms. Reid, however, the principal told her that "she didn't believe that Matthew really needed to be kept back."

Mathew spent the next year in California and then returned to D.C. By that time, test scores placed him in the bottom one percent of his age group for reading comprehension and the bottom five percent for reading overall. Nonetheless, without performing any disability evaluation, the school district placed Mathew in a regular fourth-grade class. Only after a full school

year of unsatisfactory grades did DCPS recognize Mathew's disability and develop an IEP.

Under this IEP, Mathew was retained in fourth grade and attended ten hours per week of special education instruction plus twice-weekly half-hour language therapy sessions and one half hour per week of counseling. In accordance with IDEA's preference for avoiding separate instruction "[t]o the maximum extent possible," *see* 20 U.S.C. § 1412(a)(5), Mathew spent the remainder of the school day mainstreamed in regular classes, but received accommodations such as preferential seating and extended time for assignments. Two years later, DCPS revised Mathew's IEP to provide seventeen-and-a-half hours of special education services per week. Despite these services, testing in November of Mathew's sixth-grade year revealed him reading at a second-grade level, even though six months earlier he had been reading at a third-grade level. Mathew's overall intellectual ability placed him in the ninth percentile for his age.

Despite further testing confirming these results, Mathew's IEP team made no change in his program until April of that school year. At that point, presumably because Mathew's math skills had risen from low fourth-grade level to low sixth-grade level (though at the time Mathew was entering seventh grade and was old enough to be entering eighth), the team eliminated 250 minutes per week of math tutoring while adding 200 minutes per week of reading instruction and fifteen extra minutes per week of counseling.

Objecting to this new IEP, Mathew's mother exercised her statutory right to demand an "impartial due process hearing," *see* 20 U.S.C. §§ 1415(b)(6), (e)(1), (f)(1). She argued that "the IEP is inappropriate because Mathew requires a full-time special education program and the IEP calls for a part time special education program." The hearing officer agreed. Based on "the student's serious and extensive needs and the glaring inappropriateness of the IEP in terms of placing Mathew in a

part-time program when he requires a full-time program," the officer ordered the school district to place Mathew in "a full-time special education program with a low student teacher ratio and intensive work in reading with the other related services," designating one such program, the Accotink Academy, as Mathew's placement "at least on an interim basis." "This is a student who is capable of doing better," the hearing officer wrote, "and as he approaches adolescence, the likelihood of his remaining interested in staying in school will decrease if his reading level stays at a second grade level."

To make up for deficiencies in Mathew's prior education, Ms. Reid also sought extra instruction beyond his Accotink Academy IEP—in other words, "compensatory education." In separate proceedings related to that claim, a second hearing officer heard expert testimony indicating, among other things, that in struggling to read, Mathew had "learned compensatory strategies that are counterproductive," that "there was a gap in between what [Mathew] was capable of, and actually what he was performing," and that because of academic and interpersonal difficulties, Mathew had grown "significantly depressed." Three experts—a psychologist, a speech language pathologist/audiologist, and an educational consultant—all testified that the school district should have known Mathew was disabled in second grade or earlier. Based on this evidence, and building on the earlier hearing, the hearing officer concluded that DCPS had denied Mathew FAPE for roughly four-and-a-half years, from midway through second grade until the Accotink placement at the end of sixth grade (skipping Mathew's year in California and counting both fourth-grade years).

As a remedy, the officer ordered 810 hours of compensatory education, a figure he derived by awarding "1 hour for each day of special education services not provided." Indicating neither why he chose this formula nor what specific services should be

provided, the officer empowered Mathew's IEP team to "direct[]" implementation of the award. "The services are to be reduced or discontinued," he added, "on the decision of the IEP team that Minor no longer needs or is not benefitting from this compensatory education. The team's decision that Mathew no longer needs or is not benefitting from this award of compensatory education services will terminate this award. The team decision and reasoning in this regard are to be fully explained in the IEP meeting notes."

Under IDEA, parties aggrieved by an administrative decision may sue in either state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). The court then "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *See id.* § 1415(i)(2)(B). Seeking such review in the U.S. District Court for the District of Columbia, Mathew and his mother challenged both the number of hours awarded as compensatory instruction and the allowance for reduction or termination by the IEP team. On cross-motions for summary judgment, the district court rejected the Reids' two claims (as well as a third argument not renewed here) and affirmed the administrative award. *See Reid v. District of Columbia*, 310 F. Supp. 2d 137 (D.D.C. 2004). The Reids now appeal.

## II.

We begin with our standard of review. Though conceding that judicial review under IDEA is more rigorous than in typical agency cases, the school district argues that both our review of the district court and the district court's review of the hearing officer should be deferential. We disagree on both counts.

To start with the standard applicable in the district court, it is true that under our precedent "a party challenging the

administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989) ("*Kerkam I*"). But we have also made clear that given the district court's authority to "hear additional evidence at the request of a party" and "bas[e] its decision on the preponderance of the evidence," *see* 20 U.S.C. §§ 1415(i)(2)(B)(ii), (iii), IDEA "plainly suggest[s] less deference than is conventional" in administrative proceedings. *See Kerkam I*, 862 F.2d at 887. Moreover, a hearing decision "without reasoned and specific findings deserves little deference." *See Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) ("*Kerkam II*") (internal quotation marks omitted).

In this case, although the hearing officer made express findings regarding DCPS's four-and-a-half-year denial of FAPE, he set forth the 810-hour award in a one-sentence ipse dixit. "At rate of 1 hour for each day of special education services not provided," he wrote, "DCPS is to provide 810 hours (4.5 multiplied by 180 school days) of compensatory education services to Mathew as his IEP team directs." The officer's order contains neither reasoning to support this hour-per-day formula nor factual findings showing that the 810-hour result satisfied Mathew's needs. Accordingly, the district court, obligated by IDEA to ensure that relief set forth in the administrative award was "appropriate," could not simply rely on the hearing officer's exercise of discretion. Instead, the court had to examine the record itself. Nor, regarding the other issue in this case, could the court defer to the officer's decision to delegate authority to the IEP team, for the officer's implicit ruling on that issue—that IDEA permits such delegations—raises an issue of statutory construction, a pure question of law that courts review de novo. Thus, on neither issue in this appeal could the district court presume the validity of the hearing officer's action.

We reach a similar conclusion regarding the standard governing our review of the district court's decision. As noted above, trial judges in IDEA cases may "hear additional evidence" and fashion "appropriate relief." *See* 20 U.S.C. §§ 1415(i)(2)(B)(ii), (iii). These powers of fact-finding and remedy-crafting, the Supreme Court has explained, entail "broad discretion" and implicate "equitable considerations." *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993) (internal quotation marks omitted). Thus, had the district court actually exercised those powers, our review would be deferential—clear error as to any factual findings and abuse of discretion as to the remedy. *See Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 466-67 (7th Cir. 2000) (fact-finding); *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994) (remedial discretion). In this case, however, the district court granted summary judgment based simply on the administrative record. Applying the familiar Rule 56 standard, the court took no additional evidence, but viewed the record in the light most favorable to plaintiffs and concluded that the administrative award was appropriate. *See Reid*, 310 F. Supp. 2d at 144-45, 153 (applying standard of review based on Fed. R. Civ. P. 56). On appeal, therefore, we find ourselves in exactly the same position as the district court. Accordingly, we review its decision de novo as in an ordinary summary judgment case, *see, e.g.*, *Maydak v. United States*, 363 F.3d 512, 515 (D.C. Cir. 2004), and apply the same non-deferential standard the district court should have applied to the hearing decision.

With these principles in mind, we turn to the disputed issues: the compensatory education amount and the IEP team delegation.

*Compensatory Award*

Under the theory of "compensatory education," courts and hearing officers may award "educational services . . . to be

provided prospectively to compensate for a past deficient program." *See G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003). Embraced in some form by several circuits, *see, e.g.*, *id.* at 308-09; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 249 (3d Cir. 1999); *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ.*, 79 F.3d 654, 656 (7th Cir. 1996); *Parents of Student W.*, 31 F.3d at 1496; *Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 188-89 (1st Cir. 1993); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986); *see also Diatta v. District of Columbia*, 319 F. Supp. 2d 57, 65 (D.D.C. 2004), this theory builds on the Supreme Court's holding in *Burlington* that "appropriate" IDEA relief may include reimbursement for parents who place children in private school rather than accept a deficient public school IEP, *see* 471 U.S. at 369. If IDEA permits reimbursement for educational services, courts have reasoned, then it must also allow awards of the services themselves. *See, e.g.*, *Bd. of Educ. of Oak Park & River Forest High Sch.*, 79 F.3d at 655-56; *Pihl*, 9 F.3d at 188-89; *Miener*, 800 F.2d at 753. Based on such logic, courts have upheld awards requiring, among other things, special programs to make up for prior deficiencies, *see, e.g.*, *Diatta*, 319 F. Supp. 2d at 65; *Westendorp v. Indep. Sch. Dist. No. 273*, 35 F. Supp. 2d 1134, 1135-36, 1137 (D. Minn. 1998); *cf. G. ex rel. RG*, 343 F.3d at 299, 309 (remanding claim of eleven-year-old), and instruction beyond age twenty-one (ordinarily the limit of IDEA coverage, *see* 20 U.S.C. § 1412(a)(1)(A)), *see, e.g.*, *Ridgewood Bd. of Educ.*, 172 F.3d at 249; *Pihl*, 9 F.3d at 189-90.

In our view, this extension of *Burlington* to cover services as well as payments makes eminent sense. Given the availability of reimbursement for compensatory instruction, were it impossible to obtain an award of the instruction itself, children's access to appropriate education could depend on their parents' capacity to front its costs—a result manifestly incompatible with IDEA's purpose of "ensur[ing] that *all*

children with disabilities have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Even worse, students who remained in public school would lack any effective redress for FAPE denials, even those extending over many years, as in Mathew's case. To be sure, such students could seek prospective correction of a deficient IEP, as the Reids did in the first administrative proceeding described above. But because the *Rowley* standard requires only that schools provide "some educational benefit," *see Rowley*, 458 U.S. at 200—a standard that looks to the child's present abilities—an IEP conforming to that standard carries no guarantee of undoing damage done by prior violations. As this case demonstrates, moreover, that damage may be quite severe: according to expert testimony, Mathew not only failed to keep pace with his peers under the school district's IEP, but actually learned "counterproductive" compensatory techniques that he must now unlearn before he can advance. Consistent with Congress's stated aim of "ensur[ing] that the rights of children with disabilities and parents of such children are protected," *see* 20 U.S.C. § 1400(d)(1)(B), we therefore join our sister circuits and hold that compensatory education awards fit comfortably within the "broad discretion" of courts fashioning and enforcing IDEA remedies, *see Carter*, 510 U.S. at 15-16.

That said, we part company with the Reids regarding how such awards are calculated. They urge us to adopt a presumption that each hour without FAPE entitles the student to one hour of compensatory instruction, a standard apparently embraced by several courts. *See, e.g.*, *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391-92, 396-97 (3d Cir. 1996) (holding that when "a school district . . . knows or should know" that a disabled child's educational program is deficient yet fails to correct the problem, the child "is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem"); *Westendorp*, 35 F. Supp. 2d at 1137

(holding that "where [plaintiff] was denied his IDEA rights for six academic years, the court will presume that he is entitled to six academic years of compensatory relief"). In our view, this cookie-cutter approach runs counter to both the "broad discretion" afforded by IDEA's remedial provision and the substantive FAPE standard that provision is meant to enforce.

As to the remedial provision, the Supreme Court has emphasized that IDEA relief depends on "equitable considerations." *See Carter*, 510 U.S. at 15-16; *Burlington*, 471 U.S. at 374. Accordingly, "compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting 'appropriate relief.'" *Parents of Student W.*, 31 F.3d at 1497. More specifically, as the Fourth Circuit has explained, "[c]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. ex rel. RG*, 343 F.3d at 309. Overlooking this equitable focus, the Reids' hour-for-hour formula in effect treats compensatory education as a form of damages—a charge on school districts equal to expenditures they should have made previously. Yet "[t]he essence of equity jurisdiction" is "to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). In keeping with that principle of case-specific flexibility, we agree with the Ninth Circuit that "[t]here is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W.*, 31 F.3d at 1497.

Reinforcing this conclusion, the substantive FAPE standard—the rule of law the Reids seek to enforce—also carries a qualitative rather than quantitative focus. As IDEA

itself states, the statute's aim is to guarantee disabled students "specialized education and related services *designed to meet their unique needs*." *See* 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Hence, as the Supreme Court explained in *Rowley*, "the basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are *individually designed* to provide educational benefit to the handicapped child." *See* 458 U.S. at 201 (internal quotation marks omitted) (emphasis added). We think it would be highly incongruous if this qualitative focus on individual needs gave way to mechanical hour-counting when past rather than current violations of the FAPE standard were at issue. Accordingly, just as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments.

Unlike the Reids' one-for-one standard, this flexible approach will produce different results in different cases depending on the child's needs. Some students may require only short, intensive compensatory programs targeted at specific problems or deficiencies. Others may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE. In addition, courts have recognized that in setting the award, equity may sometimes require consideration of the parties' conduct, such as when the school system reasonably "require[s] some time to respond to a complex problem," *M.C.*, 81 F.3d at 397, or when parents' refusal to accept special education delays the child's receipt of appropriate services, *Parents of Student W.*, 31 F.3d at 1497. In every case, however, the inquiry must be fact-specific and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.

Given this standard, neither party in this case is entitled to summary judgment. As to the Reids, because we reject the one-for-one formula they advocate, the amount of compensatory education appropriate in Mathew's case cannot be determined as a matter of law. Rather, designing Mathew's remedy will require a fact-specific exercise of discretion by either the district court or a hearing officer. As to the school district, although 810 hours certainly seems like a significant award, without grounds for deference to the hearing officer we may conclude at summary judgment that this remedy was correct as a matter of law only if our review of the record reveals that any greater remedy would amount to an abuse of discretion. We cannot reach that conclusion because, drawing all inferences in Mathew's favor, as we must at summary judgment, *see, e.g.*, *Maydak*, 363 F.3d at 515, we have no basis for concluding that 810 hours—barely more than half of a single academic year—would suffice to make up for Mathew's four-and-a-half years without FAPE, especially considering that during that period he developed "counterproductive" reading habits.

The district court appears to have granted summary judgment to the school district simply because it assumed that compensatory awards need only provide "some benefit" going forward, as in an ordinary non-compensatory IEP under *Rowley*. Applying this standard and assuming that it could defer to the hearing officer, the district court faulted Mathew for "fail[ing] to offer proof regarding why the hearing officer's award is 'inappropriate' to achieve what is required by the Act, *i.e.*, a basic floor of opportunity and 'access to specialized instruction and related services which are individually designed to provide educational benefit to [Mathew].'" *See Reid*, 310 F. Supp. 2d at 150 (quoting *Rowley*, 458 U.S. at 201) (alteration in original). In particular, based on the additional assumption that the Accotink Academy IEP already compensated Mathew to some degree, the court faulted the Reids for "fail[ing] to provide the Court with a copy of Mathew's current IEP," a lapse the court

believed left it "unable to assess whether the services [Mathew] is already receiving are inadequate to compensate for the prior denial of FAPE, which might justify a larger compensatory education award." *Id.* at 152.

As we have explained, however, whereas ordinary IEPs need only provide "some benefit," compensatory awards must do more—they must *compensate*. Accordingly, the district court should not have assumed that the Accotink Academy placement, based as it was only on *Rowley*, provided compensation. If anything, at summary judgment the court should have assumed the opposite, requiring DCPS to offer proof that the placement compensated for prior FAPE denials in addition to providing some benefit going forward. Nor should the district court have assumed the adequacy of the 810-hour award, for that award, as we have also explained, deserved "little deference," *Kerkam II*, 931 F.2d at 87 (internal quotation marks omitted). To be sure, as the "party challenging the administrative determination," the Reids "must at least take on the burden of persuading the court that the hearing officer was wrong," *Kerkam I*, 862 F.2d at 887, but given the minimal deference owed to the hearing award in this case, they could satisfy that burden simply by pointing to the award's evident arbitrariness. Thus, with the district court's incorrect assumptions stripped away, the Reids' failure to present evidence beyond the administrative record provides no justification for awarding summary judgment to the school district.

Offering yet another theory for affirming the hearing award, the school district argues that because the Reids based their challenge to the compensatory education award on their favored one-for-one standard, reversing the district court's grant of summary judgment would require us to accept that mechanical approach. We disagree. Although the Reids focus on the one-for-one theory here, as they did in the district court, the relevant claim in their complaint states not that Mathew was entitled to

hour-for-hour relief, but rather that the hearing officer erred by "limit[ing] relief to one hour for each day that defendants denied a free public education to Mathew Reid." *See* Compl. at 6. Moreover, based on that theory, Mathew sought not just an injunction directing defendants to provide an amount of compensatory education consistent with the hour-for-hour formula, but also a declaration that the administrative award "did not adequately compensate Mathew Reid for defendants' denial of a free appropriate education to Mathew Reid." *See id.* at 7. Far from waiving their claim to the latter relief, the Reids assert here, again as they did in the district court, that "[t]he absence of any explanation or support in the record before the hearing officer itself would be enough to require reversal of the district court's decision." Appellant's Br. at 19; *see also Reid*, 310 F. Supp. 2d at 146 n.7 (discussing Reids' argument that "the hearing officer 'fail[ed] to acknowledge the appropriateness standard, fail[ed] to explain why one hour of compensatory education for each day of FAPE denied is "appropriate," and fail[ed] to explain why a lump sum award of five years . . . is not appropriate'" (quoting plaintiffs' memorandum) (alterations and ellipsis in original)). Because this claim to relief based solely on the hearing award's inadequacy is entirely consistent with our analysis here, we see no reason why our disagreement with the Reids' favored one-for-one formula should compel us to endorse the hearing officer's equally flawed hour-per-day approach.

Accordingly, we will affirm the district court's denial of the Reids' motion but reverse its grant of summary judgment to the school district. On remand, the district court may solicit additional evidence from the parties and fashion an appropriate compensatory education award based on the principles outlined in this opinion. *See* 20 U.S.C. § 1415(i)(2)(B). Alternatively, in light of the absence of pertinent findings in the administrative record and given that both parties previously filed cross-motions for summary judgment rather than exercising their right to "request" consideration of additional evidence, the district court

may determine that the "appropriate" relief is a remand to the hearing officer for further proceedings.  *See, e.g.*, *JH ex rel. JD v. Henrico County Sch. Bd.*, 395 F.3d 185, 198 (4th Cir. 2005) (remanding IDEA suit to district court with instructions to remand to hearing officer); *Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 152 F.3d 1159, 1160 (9th Cir. 1998) (ordering district court to stay proceedings and remand to hearing officer). Whichever path the court chooses, the parties must have some opportunity to present evidence regarding Mathew's specific educational deficits resulting from his loss of FAPE and the specific compensatory measures needed to best correct those deficits.

*The IEP Team*

The Reids' second challenge raises a straightforward question of law:  may IDEA hearing officers authorize IEP teams to "reduce or discontinue" compensatory education awards?  Disagreeing with the district court, we answer no.

As the Reids point out, IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child."  *See* 20 U.S.C. § 1415(f)(3).  The award at issue runs afoul of this prohibition, for Mathew's IEP team, like any other, must include "a representative of the local educational agency," *see id*. § 1414(d)(1)(B)(iv)—presumably an employee of that agency—and when modifying an award set by the hearing officer the IEP team would in effect exercise the officer's powers.  It makes no difference that the IEP team also includes non-employees such as Mathew's mother.  Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions.

Nor does it make any difference that IDEA affords "procedural safeguards" to protect parents and students from

arbitrary action by IEP teams. *See Reid*, 310 F. Supp. 2d at 153. To be sure, if Mathew's team reduced his award, his mother could again seek a due process hearing and even judicial review. Yet as IDEA makes plain, hearing awards "shall be final" unless modified through administrative appeal or judicial action. *See* 20 U.S.C. § 1415(i)(1)(A). Consistent with that requirement, once a parent challenges an IEP and obtains final relief, as Ms. Reid has done, preservation of that relief requires no further action on the parent's part. To the contrary, before any reduction in an adjudicated award of compensatory instruction may take effect, the school district—the party whose failures, after all, necessitated awarding relief in the first place—must initiate new proceedings before a hearing officer. *Cf. Helms v. McDaniel*, 657 F.2d 800, 805 (5th Cir. 1981) ("To appoint an officer to conduct the hearing but then to treat his report only as a recommendation violates the Act's requirement that the decision of the hearing officer be final unless appealed."). By the same token, of course, any increase sought by Ms. Reid over the school district's objection must be justified to a hearing officer. The point is that absent a new hearing, the existing award is binding on both parties.

In sum, while the IEP team certainly must monitor Mathew's progress and coordinate compensatory relief with his current IEP, a delegation that permits the team to reduce or terminate his awarded amount of compensatory education exceeds the statute's bounds. We will therefore reverse the district court's ruling on this issue.

## III.

Neglected by the school system charged with affording him free appropriate education, Mathew Reid is entitled to compensatory instruction. He is not entitled, however, to an amount of such instruction predetermined by a cookie-cutter formula, but rather to an informed and reasonable exercise of

discretion regarding what services he needs to elevate him to the position he would have occupied absent the school district's failures. Accordingly, the district court's award of summary judgment to the school district is reversed and the matter remanded for further proceedings consistent with this opinion. Any modified award may not delegate authority to the IEP team to reduce or discontinue the prescribed compensatory instruction.

*So ordered.*

*Henderson*, *Circuit Judge, concurring in the judgment*:  I agree that this case should be remanded because the district court relied on an inadequate administrative record to support the administrative law judge's (ALJ's) award of 810 hours of compensatory education to Mathew Reid.  Nevertheless, I write separately to emphasize my view that, despite the district court's equitable authority under the Individuals with Disabilities Act (IDEA), *see Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985), to "hear additional evidence at the request of a party" and "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(B)(ii) & (iii), the record in an IDEA case is supposed to be made not in the district court but primarily at the administrative level, where the parties and the school authorities, sometimes with input from other professionals, can tailor an individualized education plan (IEP) to the student's needs.  *Id.* at § 1415(f)(1)-(2) & (h).  Denying a party's request to hear additional evidence is a valid exercise of the district court's discretion that should be upheld except where, as here, the administrative record is deficient.  Had the ALJ made a sufficient record, I would not have hesitated to affirm the district court's grant of summary judgment without additional proceedings.