**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 22-1048**

─────────

HIND BOUABID, as lawful guardian ad litem of Minor Child A.C.,

      Plaintiff – Appellant,

v.

CHARLOTTE-MECKLENBURG SCHOOLS BOARD OF EDUCATION,

      Defendant – Appellee,

and

NORTH CAROLINA STATE BOARD OF EDUCATION; MARK JOHNSON, State Superintendent of Public Instruction, in his official and individual capacity; SHERRY H. THOMAS, NC Department of Public Instruction Interim Director of Exceptional Children, in her official and individual capacity; ANN W. STALNAKER, Assistant Superintendent for Programs for Exceptional Children, in her official and individual capacity; ERIC MATTHEW BAILEY; AMANDA MCPETERS, Exceptional Children's Case Manager/Exceptional Children's Teacher, in her individual and official capacity,

      Defendants.

------------------------------

COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,

      Amicus Supporting Appellant.

NORTH CAROLINA SCHOOL BOARDS ASSOCIATION,

      Amicus Supporting Appellee.

─────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:19−cv−00030−RJC−DSC)

---

Argued:  January 26, 2023                              Decided:  March 15, 2023

---

Before WILKINSON, AGEE, and WYNN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Wynn joined.

---

**ARGUED:**  Kelli Lorraine Espaillat, KINCAID & ASSOCIATES, Wilmington, North Carolina, for Appellant.  Ashley Frances Leonard, CAMPBELL SHATLEY, PLLC, Asheville, North Carolina, for Appellee. **ON BRIEF:**  Keith Howard, Carla Fassbender, THE LAW OFFICES OF KEITH L. HOWARD, PLLC, Cornelius, North Carolina, for Appellant.  Christopher Z. Campbell, CAMPBELL SHATLEY, PLLC, Asheville, North Carolina, for Appellee.  Ellen Saideman, LAW OFFICE OF ELLEN SAIDEMAN, Barrington, Rhode Island; Selene Almazan-Altobelli, COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., Towson, Maryland, for Amicus Council of Parent Attorneys and Advocates, Inc.  Deborah R. Stagner, Stephen G. Rawson, THARRINGTON SMITH LLP, Raleigh, North Carolina, for Amicus North Carolina School Boards Association.

---

WILKINSON, Circuit Judge:

Hind Bouabid filed a petition asserting that Charlotte-Mecklenburg Schools (CMS) failed to provide her daughter, A.C., with a free appropriate public education in violation of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1400 *et seq.* After a ten-day hearing, an administrative law judge (ALJ) ruled for Bouabid on two of the seven issues she had raised but against her on all others. Bouabid sought review in federal court, contending that the ALJ had improperly delegated the remedy for the two issues and erred in deciding the rest. Bouabid further argued that the ALJ's adverse findings were not entitled to deference, primarily for lack of detail. The district court was unpersuaded and granted summary judgment to CMS. Because we hold that the ALJ's findings were regularly made and that its chosen remedy was lawful, we affirm the judgment.

I.

CMS, a local education agency receiving federal funds under the Individuals with Disabilities Education Act, operates the school district in Mecklenburg County, North Carolina, which has its seat in Charlotte. Bouabid's daughter, A.C., has attended CMS schools since she was in pre-kindergarten. A.C. has received special education services throughout that time and is diagnosed with severe autism. When Bouabid filed her petition, A.C. faced significant deficits in linguistic, behavioral, and academic skills.

After starting out in regular classrooms, A.C. was placed by her individual education program (IEP) team—consisting of Bouabid, teachers, and school officials—in progressively more specialized learning environments. In June 2014, before the start of

seventh grade, A.C. began receiving additional educational services under the "Autism" eligibility category.

For ninth grade, A.C. started attending Mallard Creek High School, a regular public school operated by CMS. A.C. exhibited academic and behavioral difficulties there. She required adult supervision at all times and could not consistently complete tasks. She also displayed aggressive behaviors such as hitting peers, pulling their hair, and laughing and yelling uncontrollably. A.C. further suffered from echolalia, a condition where one person meaninglessly repeats another's spoken words.

A.C.'s IEP team met several times during the 2016–17 school year before deciding in June that A.C. should attend Metro School the following year. Metro School is a public school operated by CMS for children with cognitive disabilities. Bouabid opposed the school change.

Shortly before A.C. started at Metro School, Bouabid requested that CMS conduct independent education evaluations (IEEs) concerning A.C.'s autism and her psychological, educational, linguistic, occupational, and behavioral abilities. CMS denied her request.

Then, after A.C. began tenth grade, Bouabid filed a due process petition with the North Carolina Office of Administrative Hearings, alleging that CMS had denied A.C. a free appropriate public education (FAPE) under the IDEA by:

1) failing to place A.C. in the least restrictive educational environment (for the tenth grade);

2) placing A.C. in a separate school (for the tenth grade);

4

3) failing to develop and implement appropriate behavioral interventions (for the ninth and tenth grades);

4) failing to develop appropriate IEPs (for the ninth grade);

5) failing to provide appropriate related services (for the ninth grade);

6) failing to let Bouabid meaningfully participate in IEP meetings (for the ninth grade) and predetermining A.C.'s school placement for the tenth grade before the IEP meeting in June 2017; and

7) refusing to provide Bouabid with IEEs upon her request and failing to file for a due process hearing to show that its evaluations were appropriate.

Bouabid requested that A.C. be transferred to a private school or regular public high school, with compensatory special education services. Her petition prompted a hearing before an ALJ from the North Carolina Office of Administrative Hearings. The hearing took place over ten days across three months in early 2018. The ALJ heard from nine witnesses for Bouabid and another six for the school district. The ALJ was also presented with forty-five exhibits from Bouabid and thirty-eight from the school district. (Many of the parties' exhibits overlapped.)

The ALJ issued a nine-page decision in June 2018, finding for Bouabid on the first two issues she had raised—least restrictive environment and school placement—but for the school district on the remaining five. Specifically, the ALJ faulted the school district for failing to establish "any requirement or benchmark or measurable criteria that [A.C.] must meet in order for the IEP team to consider . . . a change to a lesser restrictive environment than [a] separate school." J.A. 387. As to the other issues, the ALJ found that Bouabid had

5

not met her burden of proof by a preponderance of the evidence. The ALJ detailed her reasoning in sixteen findings of fact and eleven conclusions of law. The ALJ noted, for example, that she found the testimony of five witnesses—four for the school district and one for Bouabid—"to be credible and more persuasive than other witnesses on all of the issues." J.A. 384.

After exhausting her administrative remedies, Bouabid filed suit in the Western District of North Carolina, claiming error by the ALJ under the IDEA as well as disability-based discrimination by the school district under the Rehabilitation Act of 1973, the Americans with Disabilities Act, and the Fourteenth Amendment's Equal Protection Clause. Bouabid sought declaratory relief, compensatory education and related services, and damages. A year later, the district court dismissed all of Bouabid's claims except for her appeal of the ALJ's decision. *Bouabid v. Charlotte Mecklenburg Sch. Bd. of Educ. (Bouabid I)*, No. 319CV00030RJCDSC, 2020 WL 1082491, at *6 (W.D.N.C. Mar. 6, 2020). As to that, Bouabid and the school district each subsequently moved for summary judgment. Applying a "mandated deferential standard" based upon the ALJ's ruling, the district court ruled in the school district's favor. *Bouabid v. Charlotte Mecklenburg Sch. Bd. of Educ. (Bouabid II)*, No. 319CV00030RJCDSC, 2021 WL 5868967, at *13 (W.D.N.C. Dec. 10, 2021). The district court determined that the ALJ's factual findings were entitled to deference because they had been carefully reached. The court also considered each of the five issues raised by Bouabid, examining the record evidence, the ALJ's findings, and the parties' arguments. The court ultimately concluded that Bouabid had not demonstrated a denial of a free appropriate public education by CMS on any of the

6

five issues. The district court also upheld the ALJ's remedy for the first two issues, holding that the ALJ "did not improperly delegate her authority." *Id.* at 7.

Bouabid timely appealed.

## II.

The Individuals with Disabilities Education Act "was enacted to throw open the doors of public education and heed the needs of students with disabilities who had for too long been either completely ignored or improperly serviced by American public schools." *T.B., Jr. by & through T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 571 (4th Cir. 2018) (internal quotation marks omitted). The IDEA requires that states, in return for federal funding, guarantee children with physical and intellectual disabilities a "free appropriate public education" (FAPE). *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017) (quoting 20 U.S.C. § 1412(a)(1)(A)). A FAPE refers to "special education and related services" that "(1) [are] without charge, (2) meet the standards of the state educational agency, (3) include the appropriate level of education in the state involved and (4) are provided in conformity with an individualized education program (IEP)." *K.I. v. Durham Pub. Sch. Bd. of Educ.*, 54 F.4th 779, 784–85 (4th Cir. 2022).

"The mechanism by which a state provides a FAPE is an IEP—a document that describes the child's unique needs and the state's plan for meeting those needs." *R.F. by & through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019). The IEP must be reviewed at least once annually and "include an assessment of the child's current educational performance, . . . measurable educational goals, and . . . the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53

(2005). Parents, along with teachers and school officials, may serve on the "IEP Team" tasked with formulating a child's IEP. 20 U.S.C. § 1414(d)(1)(B).

The IDEA anticipates that parents and educators will not always agree. The statute assigns several procedural rights to parents who oppose the content of their child's IEP. First, the parents may receive an independent educational evaluation (IEE) of their child. *Id.* § 1415(b)(1). Second, the parents may pursue informal dispute resolution procedures, such as mediation or a preliminary meeting. *Id.* §§ 1415(e), (f)(1)(B)(i). In addition, for any differences that remain, a parent may request a "due process hearing" before an "impartial" state or local educational agency. *Id.* § 1415(f)(1)(A).

In North Carolina, parents exercise their right to a due process hearing by filing a petition with the Office of Administrative Hearings. N.C. Gen. Stat. § 115C-109.6(a). The Office then appoints an ALJ who "shall issue a written decision" with "findings of fact and conclusions of law." *Id.* § 115C-109.6(f). A parent who does not obtain relief from the ALJ may, under the IDEA, sue in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

While the statute is sensitive to parental concerns, its mandate to reviewing courts is "bounded." *Burke Cnty. Bd. of Educ. v. Denton By & Through Denton*, 895 F.2d 973, 981 (4th Cir. 1990). Though the reviewing court in an IDEA case must "make an independent decision based on a preponderance of evidence," the ALJ's findings are generally considered "*prima facie* correct." *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103, 105 (4th Cir. 1991); *R.F.*, 919 F.3d at 245; *T.B.*, 897 F.3d at 574. A contrary standard of review would not only undermine the IDEA's "implied requirement that *due weight* shall be given to these proceedings." *Bd. of Educ. of Hendrick Hudson Cent. Sch.*

8

*Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982) (emphasis added). It would also "render meaningless the entire process of administrative review." *School Bd. v. Malone*, 762 F.2d 1210, 1217 (4th Cir. 1985).

The deferential standard reflects the respect that courts accord to primary fact-finders. While the federal courts have an important role in IDEA interpretation, it is a role that is tempered by the limitations and inadvisability of federal courts overmanaging the many minute decisions of local school districts. There is but one exception to this deferential standard: when an ALJ has strayed "so far from the accepted norm of a fact-finding process" that its findings were not "regularly made." *Doyle*, 953 F.2d at 104–05. An ALJ who made factual determinations by "flipping a coin" or "throwing a dart," for example, would obviously not be entitled to deference. *J.P. ex rel. Peterson v. Cnty. Sch. Bd. Of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008).

III.

A.

On appeal, Bouabid first contends that the district court erred in concluding that the ALJ's findings were regularly made. Although Bouabid does not suggest a coin flip, she does accuse the ALJ of having "omit[ted] critical information on the length of the hearing, amount of evidence presented, number of issues presented, explanation of the credibility of witnesses, [and] findings of fact on critical issues." Appellant Br. at 12. Her argument chiefly concerns the level of detail in the ALJ's nine-page decision, which featured sixteen findings of fact.

9

Our "regularly made" inquiry does not begin, however, with the ALJ's written product. To the contrary, we have "typically focused on the *process* through which the findings were made." *J.P.*, 516 F.3d at 259. When first describing the "regularly made" inquiry in *Doyle*, we did not even refer to the presentation of the ALJ's findings. We instead urged reviewing courts to consider "*the way* in which the state administrative authorities have arrived at their administrative decision and *the methods* employed." 953 F.2d at 105 (emphasis added). In the three decades since *Doyle*, we have only infrequently found that insufficient detail in an ALJ's written decision warranted a rejection of the customary deference. *See Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 663 (4th Cir. 1998); *D.B. v. Craven County Board of Education*, 2000 WL 341912, at *5 (4th Cir. 2000). Even in those cases, we indicated that the ALJ's "cursory and conclusory" decision was only one of multiple grounds for the non-deferential review. *Springer*, 134 F.3d at 663, 665; *D.B.*, 2000 WL at 341912, at *5.

In the present case, Bouabid takes no issue with the process afforded her by the ALJ prior to the written decision. Nor can she. Bouabid received a lengthy, ten-day hearing before a third-party administrator in which she was able to present more witnesses (nine) and exhibits (forty-five) than the school district did. Bouabid also had the opportunity to deliver opening and closing arguments, cross-examine witnesses, and raise evidentiary issues. Bouabid does not refer, indeed, to rulings by the ALJ preventing her from introducing additional evidence or testimony. A ten-day hearing, which generated over 2,500 pages of transcript, is no brush off the back of the hand. There is simply no sign in the record or Bouabid's briefs that the ALJ did anything but "conduct[] a proper hearing,

10

allowing the parent[] and the School Board to present evidence and make arguments." *J.P.*, 516 F.3d at 259.

We thus do not start from a blank slate when evaluating the contents of the ALJ's written decision. While the opportunities that Bouabid received in her due process hearing may not be dispositive of her "regularly made" argument, we must recognize that "all indications" point to the ALJ having "resolved the factual questions in the normal way, without . . . abdicating [her] responsibility to decide the case." *Id.*

When an ALJ's decision is grounded in procedural care, we have required reviewing courts to be especially deferential in their scrutiny. Here the ALJ did a lot of things right. Her decision met the IDEA's condition that it be in writing unless the parent has requested an electronic format. 20 U.S.C. § 1415(h)(4). It likewise complied with North Carolina's requirement that it "contain findings of fact and conclusions of law." N.C. Gen. Stat. § 115C-109.6(f). Contrary to Bouabid's depiction, the ALJ did *not* "omit[]" information as to "the length of the hearing," "amount of evidence presented," and "number of issues presented." Appellant Br. at 12. The ALJ plainly specified the complete dates of the hearing, the number of exhibits provided by each party, and the full list of seven issues raised by Bouabid. J.A. 379–81. The above points, however, should not obscure the larger view. The ALJ took her time with this case. There is nothing in this record to indicate sloppiness or indifference or the desire of a decision-maker to simply rush out the door.

## B.

The adequacy of process did not deter Bouabid from contesting the inadequacy of the ALJ's findings. Fair enough. But the ALJ did record findings that shed light on her

11

reasoning for several determinations adverse to Bouabid. For instance, the ALJ stated that four of the school district's six witnesses but only one of Bouabid's nine witnesses were "credible and more persuasive . . . on all of the issues." J.A. 384. Pertinent to whether the school district implemented appropriate behavioral interventions (Issue #3), the ALJ referred to "data concerning [A.C.'s] behavior" in her "Student Portfolio" as well as teachers' "recommendations concerning behavior strategies and goals" in her "educational record." J.A. 384. Concerning whether the school district had developed appropriate IEPs (Issue #4), the ALJ found that "[t]he IEPs contain behavior-related goals which are measurable." J.A. 383. Similarly, respecting whether the school district had predetermined A.C.'s school change before June 2017 (Issue #6), the ALJ determined that the school district had only "made the decision" after the IEP team had shown itself to be "divided." J.A. 384.

Bouabid argues that the ALJ did not explain her witness credibility assessments. We have held, however, that the ALJ in an IDEA case need not "explain in detail its reasons for accepting the testimony of one witness over that of another." *Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306 (4th Cir. 2005). Credibility determinations run the gamut. A fact-finder may conclude, for example, that inconsistencies in witness testimony undermine a witness's credibility. Or a judge may assess credibility based simply upon an intuitive impression of candor. This latter is often difficult to explain and appellate courts have been reluctant to require it. To the extent a rudimentary explanation is required, the ALJ obliged by mentioning that she took into account "the demeanor of the witnesses, any interests, bias, or prejudices [they] may have,

12

[their] opportunity . . . to see, hear, know or remember the facts or occurrences about which the witnesses testified," as well as the reasonableness and plausibility of their testimony. J.A. 383. If anything, by specifying which witnesses she found most credible, the ALJ here went further than her counterpart in *J.P.*, who received deference despite merely stating that he "found all the witnesses credible." 516 F.3d at 260.

The ALJ here further demonstrated her "careful consideration" by making nuanced factual findings. J.A. 383. The ALJ actually ruled in favor of Bouabid on two issues and found that one of Bouabid's witnesses was credible, and that two from the school district were not. Moreover, the ALJ spotted that one of the school district's assertions was "contradict[ed]" by evidence. J.A. 384. The context of the ALJ's balanced decision lends additional support to the school district's contention that she "g[a]ve careful consideration" to Bouabid's witnesses and evidence. *Z.P.*, 399 F.3d at 305.

Finally, Bouabid reproaches the ALJ for "contradictions and inconsistencies," Appellant Br. at 19, but her examples are unpersuasive. That the ALJ gave "due regard" to the expertise of the school district's witnesses is not a contradiction of anything, as much as a simple comment on the weight of the evidence. J.A. 384. It was likewise not contradictory for the ALJ to find that the school district's behavioral interventions were "appropriate," even if "not successful." J.A. 383–84. Finally, while the ALJ determined that the school district "never told" Bouabid about a process for exiting Metro School, J.A. 384, it is not apparent that this information mattered for Bouabid's participation in IEP meetings in the 2016–17 school year (Issue #6), when A.C. was still enrolled at Mallard Creek High.

13

It is always possible, of course, to pick fault with any set of findings. But the test is one of adequacy, not perfection. We have "never suggested that any particular level of detail is required." *J.P.*, 516 F.3d at 262. We do note that the ALJ's findings in this case differed markedly from the findings in *J.P.*, where we upheld an ALJ who gave no indication which witnesses he found most credible and "no explanation of which evidence [he] found to be most important." *Id.* In another case, we reversed the district court for failing to defer to an ALJ who had not explained why he credited the testimony of some witnesses over others. *Z.P.*, 399 F.3d at 311. We explained, as noted, that the "regularly made" inquiry does not require an ALJ to detail "reasons for accepting the testimony of one witness over that of another." *Id.* at 306.

The point here is not to discourage ALJs from making careful findings or to discount their utility. In fact, we take the occasion to emphasize the important role that ALJs play in communicating to the parents of disabled students that society does care and that it did listen. Findings can play an important role in that regard. Parents can be a child's one champion, and many devote their time and energy to what may be an arduous process, but one which holds at the end of the day the hope of realizing what is most appropriate and most likely to realize the lifetime potential of their child.

It is true of course that this is an "aspirational standard," but no less meaningful for that. *J.P.*, 516 F.3d at 262. It is also a practical standard which must be applied in the day-to-day vortex of an up-and-down school year. The IDEA was made flexible for states and school districts large and small. Rather than empowering courts to micromanage state hearings, the statute entrusted them to be "conducted by the State educational agency or by

14

the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). The latitude afforded to ALJs in the IDEA context reflects in part the time constraints under which they operate. Parents seeking a school change, for example, are understandably eager to obtain quick relief: the academic year marches forward and parents wish to know what exactly might await their child. In North Carolina, ALJs are required to issue decisions within 45 days of the end of a hearing or the reception from the parties of proposed findings of fact. 26 N.C. Admin. Code 03.0127. "[T]his short time-frame means that the written opinions may be issued before a transcript has been prepared." *J.P.*, 516 F.3d at 263. For this reason and others, courts do not insist on perfection or demand from an ALJ "the level of detail and analysis we expect from a district judge." *Id.*

Based on the extensive process Bouabid received in the handling of her case, as well as the detail provided in the ALJ's written decision, we affirm the district court's determination that the ALJ's findings were regularly made. We further hold that the district court was correct to accord those findings deference and to determine that Bouabid failed to prevail by a preponderance of the evidence on the five issues she disputes. While the deference in these cases is owed the ALJ, it is not remiss to point out that the district court likewise proceeded with its own thorough review in a lengthy opinion. *Bouabid II*, 2021 WL 5868967. Bouabid does not persuasively challenge the court's decision on appeal, and we see no reason to disturb its fine analysis.

15

IV.

Bouabid's remaining argument is that the relief accorded by the ALJ—for the two issues resolved in Bouabid's favor—was unlawful. As noted above, the ALJ determined that the school district "failed to address the standard of behavior or to provide any benchmark that [A.C.] must meet in order for the IEP team to consider a change to a less restrictive environment than public separate school." J.A. 383. The ALJ reasoned that the absence of such metrics failed to ensure that A.C. would be instructed in the "least restrictive environment" possible. J.A. 386–87. The ALJ accordingly ordered the school district to "revise [A.C.'s] IEP to include benchmark(s) and criteria for least restrictive environment . . . before. . . the 2018–19 school year." J.A. 387.

Bouabid takes issue with this remedy, which was upheld by the district court, for allowing the school district to decide the "benchmark(s) and criteria" that would allow A.C. to leave Metro School. Her position is that this relief improperly delegates remedial authority to CMS, letting "the School District [] determine the remedy for its own wrongdoing." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 317 (6th Cir. 2007). For the following reasons, we find this argument unpersuasive.

A.

As an initial matter, the IDEA confers flexible remedial powers on the ALJ and the reviewing court. A court is notably authorized by the statute to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "The ordinary meaning of these words confers broad discretion on the court." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). As to ALJs, the IDEA's principal

16

limitation on their remedial authority is set forth in a provision concerning attorney fees, which generally "may not be awarded" to parents who would have obtained a better outcome from a settlement offer. 20 U.S.C. § 1415(i)(2)(C)(iii). Courts have thus viewed ALJs in IDEA cases as having broad remedial authority as well. *See, e.g.*, *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1084 (8th Cir. 2020); *J.T. v. D.C.*, 496 F. Supp. 3d 190, 211–12 (D.D.C. 2020).

The IDEA did not "displac[e] the traditional notion that primary responsibility for education belongs to state and local school boards, educators, parents, and students themselves." *T.B.*, 897 F.3d at 572. Courts, including our own, have upheld remedies that leave certain details of implementation to school officials and IEP teams. *See, e.g.*, *Morgan v. Greenbrier Cnty. W. Virginia Bd. of Educ.*, 83 F. App'x 566, 569 (4th Cir. 2003) (affirming ALJ remedy that "directed the IEP committee to meet within 15 days to prepare an appropriate [IEP]" and "specified the procedures that had to be followed"); *Adams v. D.C.*, 285 F. Supp. 3d 381, 393 (D.D.C. 2018) (finding parent unlikely to show that ALJ erred by "ordering an IEP review and revision, rather than prospective placement in a private school"); *Mary Struble v. Fallbrook Union High Sch. Dist.*, No. 07CV2328-LAB CAB, 2011 WL 291217, at *7–8 (S.D. Cal. Jan. 27, 2011) (affirming ALJ remedy that "order[ed] the parties to meet again and develop a new IEP which allowed [the child] to graduate with a diploma"); *Hawaii, Dep't of Educ. v. Zachary B. ex rel. Jennifer B.*, No. CIV. 08-00499JMSLEK, 2009 WL 1585816, at *11 (D. Haw. June 5, 2009) (affirming ALJ remedy where "tutoring services" were to "be determined by" child's teachers). These

17

decisions reflect the substantial discretion that ALJs and reviewing courts have under the IDEA to tailor relief to the needs of each child.

B.

Bouabid is incorrect to insist that the ALJ and district court delegated their remedial authority to the school district. To the extent some of our sister courts have identified an implicit anti-delegation principle in the IDEA, *see M.S. ex rel. J.S. v. Utah Sch. for Deaf & Blind*, 822 F.3d 1128, 1135 (10th Cir. 2016); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 318 (6th Cir. 2007); *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 527 (D.C. Cir. 2005), that rule does not apply to the present case. The ALJ ordered the respondent to add "benchmark(s) and criteria" to A.C.'s IEP, whether it agreed that these were necessary or not. J.A. 387. The ALJ did not, unlike her counterparts in *L.M.* and *Reid*, delegate the power to "reduce or terminate" that relief. 478 F.3d at 318; 401 F.3d at 518, 520. The ALJ instead precisely identified where A.C.'s IEP had fallen short and instructed CMS as to how to properly cure the deficiency.

There is good reason not to make ALJs and courts spell out every last detail in their remedial orders. Oftentimes, the members of an IEP team "are the most knowledgeable regarding [a child's] disability." *Bouabid II*, 2021 WL 5868967, at *13. It is no wonder that Congress, in enacting the IDEA, opted for "procedures [that] emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017). Even the most diligent of reviewing courts is likely to be less familiar with a child's case and "the substance and the details" of educational programs than the

18

school officials and parents who deal with such matters regularly. *Barnett by Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991).

We thus discern no abuse of remedial discretion on the part of the district court in allowing the respondent to fashion "benchmark(s) and criteria" in A.C.'s IEP indicating when she may move on from Metro School. We cannot run the Charlotte-Mecklenburg Schools from this distance. Lacking the background to know precisely which benchmarks and criteria would be suitable in A.C.'s case, the district court and ALJ reasonably looked to the school district to proceed in good faith to meet its statutory responsibilities.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

19