Behnaz MORADNEJAD,
et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, Defendant.

Civ. Action No. 14-1159 (ABJ)

United States District Court,
District of Columbia.

Signed March 31, 2016

Robert Wilson Jones, James E. Brown & Associates, PLLC, Washington, DC, for Plaintiffs.

Veronica A. Porter, Office of the Attorney General for the District of Columbia, Washington, DC, for Defendant.

## ORDER

AMY BERMAN JACKSON, United States District Judge

On March 16, 2016, Magistrate Judge G. Michael Harvey issued a Report and Recommendation [Dkt. # 21] ("R. & R.") recommending that the Court deny plaintiffs' Motion for Summary Judgment [Dkt. # 14] and grant defendant's Cross Motion for Summary Judgment [Dkt. # 16]. Local Civil Rule 72.3(b) provides that "[a]ny party may file for consideration by the district judge written objections to the magistrate judge's proposed findings and recommendations ... within 14 days after being served with a copy thereof." LCvR 72.3(b). The Report and Recommendation advised the parties that "failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations." R. & R. at 36. To date,

no objections have been filed. It is therefore

**ORDERED** that the Report and Recommendation [Dkt. # 21] is **ADOPTED** in its entirety; and it is

**FURTHER ORDERED** that plaintiffs' Motion for Summary Judgment [Dkt. #14] is **DENIED** and defendant's Motion for Summary Judgment [Dkt. # 16] is **GRANTED.**

**SO ORDERED.**

## REPORT AND RECOMMENDATION

G. MICHAEL HARVEY, UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned for full case management. Plaintiff Behnaz Moradnejad is the mother of Plaintiff P.X., a child protected by the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiffs filed this action for injunctive and declaratory relief under the IDEA. Before the undersigned are the parties' cross-motions for summary judgment. After reviewing the entire record,[1] for the reasons set forth below, the undersigned recommends that Plaintiffs' motion

be denied and Defendant's motion be granted.

## BACKGROUND [2]

Behnaz Moradnejad is the mother of P.X., who was seven years old at the time this suit was brought. AR 7. P.X. was born in 2007 and has a history of brain damage stemming from a complicated delivery, including prolonged delivery, failed vacuum evacuation, and emergency C-section. See id. at 342, 899. In 2008, P.X. was evaluated by Early Stages, a District of Columbia Public Schools ("DCPS") assessment center, which determined that P.X. had a pervasive developmental disorder that fell within the autism spectrum. Id. at 901. Subsequently, P.X. has been diagnosed with developmental coordination disorder and speech and language impairment. Id. at 347. P.X. was enrolled at Walker Jones Education Campus, which is part of the DCPS system, from February 2010 through the end of the 2012–2013 school year. See id. at 414. P.X. then enrolled at Hearst Elementary School, where, at the time this suit was brought, P.X. remained enrolled. See id.

---

1. The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiffs' Complaint ("Compl.") [Dkt. 1]; (2) Plaintiffs' Motion for Summary Judgment ("Pl.Mot.") [Dkt. 14]; (3) Defendant's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Def.Mot.") [Dkt. 16]; (4) Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pl.Opp.") [Dkt. 18]; (5) Defendant's Reply in Support of Defendant's Motion for Summary Judgment ("Def.Reply") [Dkt. 20]; and (6) the Administrative Record ("AR") 0111].

2. Plaintiffs and Defendant submitted statements of fact in conjunction with their motions for summary judgment. Those statements are not controlling in a case like this one, where review is based solely on the ad-

ministrative record. See L. Civ. R. 7(h)(2); L. Civ. R. 7(h)(2) cmt. ("This provision recognizes that in cases where review is based on an administrative record the Court is not called upon to determine whether there is a genuine issue of material fact, but rather to test the agency action against the administrative record. As a result the normal summary judgment procedures requiring the filing of a statement of undisputed material facts is not applicable."); Gore v. Dist. of Columbia, 67 F.Supp.3d 147, 151 n. 3 (D.D.C.2014). After reviewing those statements and the evidence in the record, the undersigned finds that the pertinent facts can be determined by reference to the record. For ease of reference, the undersigned draws the relevant facts from the administrative record, not the parties' statements of fact.

On January 22, 2014, Plaintiffs filed an administrative due process complaint alleging that DCPS had denied P.X. a free appropriate public education ("FAPE") by failing to develop an individualized education program ("IEP") that was reasonably calculated to provide P.X. with educational benefit. Id. at 420. Specifically, Plaintiffs alleged that P.X.'s April 12, 2012, and January 28, 2013, IEPs inappropriately changed P.X.'s placement from a full-time, self-contained special education classroom to a general education setting. Id. Plaintiffs also alleged that P.X.'s January 14, 2014, IEP inappropriately reduced P.X.'s speech and language services and failed to include "writing" as an area of concern for P.X. Id. at 423.

An administrative due process hearing was held on March 24, March 26, and April 4, 2014. Id. at 4–5. On April 22, 2014, the administrative hearing officer issued her hearing officer's determination ("HOD"), finding that Plaintiffs failed to meet their burden of proof on both claims. See id. at 11–15. Plaintiffs now seek judicial review of the April 22, 2014, HOD. In their Complaint in this Court, Plaintiffs take issue only with the denial of their first claim relating to the April 12, 2012, and January 28, 2013, IEPs. Plaintiffs do not challenge the hearing officer's findings regarding the January 14, 2014, IEP. See Compl. at 8–10. Thus, the undersigned agrees with Plaintiffs that "[d]iscussion of [the January 14, 2014, IEP] is unnecessary." Pl. Opp. at 2; see Quinn v. Dist. of Columbia, 740 F.Supp.2d 112, 130 (D.D.C.2010) (plaintiffs may not raise on summary judgment issues not raised in their complaint).[3]

### A. Starting at Walker Jones Education Campus

In February 2010, when P.X. turned three years old, he was enrolled at Walker Jones Education Campus. Compl. at 3. Pursuant to his initial IEP, dated January 14, 2010, P.X. was placed in a small, self-contained setting for autistic children. AR 47–57. P.X. was prescribed twenty-seven hours per week of specialized instruction, one hour per week of occupational therapy, 1.5 hours per week of speech-language pathology, and thirty minutes per week of physical therapy. Id. at 56. This IEP was in effect from February to June 2010. Id. at 7. His June 22, 2010, IEP progress report, which considered P.X.'s performance from April to June of that year, showed that P.X. had mastered three of his IEP goals, had shown no progress on two of his goals, and was making progress towards achieving the rest. Id. at 71–78. P.X. was still non-verbal, but had learned social skills that included taking turns and following and walking with a group. Id. at 7.

### B. Pre-Kindergarten

The following school year, 2010–2011, P.X. was removed from the self-contained autism classroom and prescribed a mixture of educational services to be administered both inside and outside of a general education pre-kindergarten classroom at Walker Jones. Id. at 125–31. This system of educating a disabled student in a general education setting to permit him or her to model off of typically developing peers is also referred to as the "inclusion model." See id. at 1377. It is generally contrasted with self-contained placements, where the

---

**3.** Defendant addresses the January 14, 2014, IEP in its motion for summary judgment, Def. Mot. at 26–28, but Plaintiffs concede that "while [issues with the January 14, 2014, IEP] were raised in the underlying pro- cess complaint, they were not part of the Plaintiffs' Complaint in this Court nor were they discussed in the Plaintiffs' Motion for Summary Judgment," Pl. Opp. at 2.

student is educated in a special education classroom and rarely, if ever, interacts with general education students. See id. at 13. P.X. was prescribed twenty-two hours per week of specialized instruction in the general education classroom and five hours per week of specialized instruction outside the general education classroom. Id. at 125–31. Towards the end of the school year, P.X.'s April 4, 2011, IEP progress report indicated that he had mastered or was making progress on most of his IEP goals. Id. at 107–119.

During the 2011–2012 school year, P.X. repeated pre-kindergarten. Id. at 8. Under a revised IEP, dated November 15, 2011, P.X. was again prescribed educational services both inside and outside the general education environment at Walker Jones. Id. at 125–131. The November 15, 2011, IEP provided 19.5 hours per week of specialized instruction in the general education classroom, five hours per week of specialized instruction outside the general education classroom, four hours per month of occupational therapy, six hours per month of speech-language pathology, and two hours per month of physical therapy. Id. The general education classroom was comprised of approximately eighteen children, nine of whom had IEPs. Id. at 919. The class was led by a general education teacher, a special education teacher, and three assistant teachers. Id. at 1370.

A January 30, 2012, IEP progress report, which covered the period from October 2011 through January 2012, indicated that P.X. had mastered four and progressed on one of his adaptive/daily living skills goals, mastered three and progressed on three of his communication/speech and language goals, progressed on both of his emotional, social, and behavioral development goals, and progressed on four and made no progress on one of his motor skills/physical development goals. Id. at

137–42. Despite his progress, P.X. struggled during the school year with vocalization. P.X.'s special education teacher at the time, Stephanie Aduso, described P.X. as needing support and prompting to communicate through speaking. Id. at 1379. He was not communicating verbally at the same level as his general education peers. Id. At the administrative due process hearing, Ms. Moradnejad testified that during the 2011–2012 school year, she was concerned that P.X. could not answer teachers' questions nor participate in classroom discussions in the general education environment. Id. at 8, 918, 921.

### C. April 12, 2012, IEP

On April 12, 2012, P.X.'s IEP team held a meeting to review P.X.'s progress and develop an IEP for P.X.'s kindergarten year. Id. at 152. P.X.'s IEP team included Ms. Aduso, P.X.'s speech-language pathologist, his occupational therapist, his physical therapist, an assessment evaluator, a paraprofessional, and a school representative. Id. The team considered and reviewed P.X's classroom-based assessments, discussed classroom observations and anecdotal notes, reviewed a pre-school language scale assessment, progress reports, and several formal assessments. Id. at 1354–55. The team discussed P.X.'s skills, strengths, and needs in the context of transitioning into kindergarten. Id. at 1357.

Ms. Moradnejad's primary concerns during this meeting were P.X.'s difficulties holding a pencil and his delays in expressive language. Id. at 8, 927. Prior to the meeting, Ms. Aduso had observed a kindergarten class at Walker Jones to understand whether it would be an appropriate placement for P.X. Id. at 1383. She testified at the due process hearing that she used experiences with P.X. in her classroom and her observations of the kindergarten classroom to help develop "the best

IEP [she] could," with the hope that "[P.X.] would continue" his growth. Id. The general education teacher and special education teacher from the kindergarten class also observed P.X. in Ms. Aduso's pre-kindergarten classroom to consider what services P.X. might need in kindergarten. Id. at 1385. The IEP team felt that it was important for P.X. to maintain time in the general education environment to work on his social interactions and develop his pragmatic and social language skills. Id. at 1362, 1364–65. The IEP team reasoned that the general education setting would allow P.X. to interact with and observe regularly developing children and use them as "peer models and language models," id. at 1358, which, when paired with accommodations in the general education environment, would help P.X. develop social and vocalization skills, id. at 1362.

At the same time, both Ms. Aduso and Ms. Moradnejad felt that in kindergarten, P.X. would need more assistance with academics. Id. at 927, 1384. Accordingly, the April 12, 2012, IEP increased his specialized instruction outside of the general education environment from five hours per week to ten hours per week and decreased his specialized instruction inside the general education classroom from 19.5 hours per week to 14.5 hours per week. Id. at 163. The amount of time prescribed for occupational therapy, speech-language pathology, and physical therapy remained the same as P.X.'s November 15, 2011, IEP. Id. Ms. Aduso testified at the administrative due process hearing that at the April 12, 2012, IEP meeting, Ms. Moradnejad never requested a wholly self-contained placement for P.X.'s kindergarten year. Id. at 1357.

### D. Kindergarten

P.X. began kindergarten at Walker Jones in August 2012, with his April 12, 2012, IEP in effect. Id. at 8–9. As before, the general education class was made up of approximately eighteen children—nine of whom had IEPs. Id. at 7. The classroom was led by a general education teacher, Lauren McAlee, a special education teacher, Neil Reimer, and two classroom aides. Id. When Mr. Reimer first met P.X., he observed that P.X. presented as having a "profound communication delay." Id. at 1191–92. P.X. also needed lots of prompting to complete tasks. Id. at 1194.

The focus of P.X.'s education during kindergarten was to build socialization and vocalization skills through the use of special education in the general education setting, which allowed P.X. to model off of typically developing peers. Id. at 1192, 1198. For approximately two-thirds to three-quarters of the time, the class had a general education teacher, a special education teacher, and a special education aide present. Id. at 1205–06. In the general education environment, peer modeling took place as P.X. observed his peers and repeated what they said and did. Id. at 1199, 1207–08.

Mr. Reimer observed that by the middle of the year, P.X. was "making a lot of improvements" in his social interactions, and his level of verbal expression went from "one spoken word in a very, very quiet voice" to "multiple words [and] phrases." Id. at 1199. When P.X. was not in the general education environment, he received more individualized instruction in a restricted environment with either Mr. Reimer, his speech-language pathologist, Lori Porcelli, or his occupational therapist, Tricia Tandle. Id. at 1203. These pull-out services combined academics with language and fine motor skills goals. Id. P.X.'s communication skills progressed and he required fewer verbal prompts to complete tasks. Id. at 1209–11. He developed spontaneous communication abilities which he lacked at the beginning of the school

year, id. at 1210, and was showing "consistent progress" in math and reading, id. at 1200. As the year went on, Mr. Reimer observed P.X. demonstrate increased engagement and academic benefit from these services. Id. at 1215.

Under the April 2012 IEP, P.X. made progress on most of his IEP goals. Id. at 1219. The first formal look at P.X.'s progress under that IEP—a June 11, 2012, IEP progress report—showed that P.X. was progressing on all of his IEP goals except a few which had just been introduced in the April 2012 IEP. Id. at 175–81. The next IEP progress report, dated November 9, 2012, indicated that P.X. was progressing on twenty-three of his twenty-six IEP goals. Id. at 203–09.

While Ms. Moradnejad observed both good and bad days for P.X. during kindergarten, she worried about whether he was being sufficiently prepared for the first grade. Id. at 715, 1212, 1215–16. She was concerned that P.X. had not yet mastered IEP goals from previous school years. Id. at 959. On January 22, 2013, Ms. Moradnejad emailed Mr. Reimer, Ms. Porcelli, and Ms. McAlee, outlining her concerns with P.X.'s IEP goals and suggesting how those goals could, in her opinion, be changed to best help P.X. prepare for the first grade. Id. at 715. Ms. Porcelli responded to Ms. Moradnejad's email with proposed revisions to P.X.'s goals, incorporating Ms. Moradnejad's suggestions. Id. at 716–18. Ms. Porcelli invited Ms. Moradnejad to make changes or recommendations to the proposed goals, to which Ms. Moradnejad responded, "I think they are good. Thanks." Id. at 716–22.

### E. January 28, 2013, IEP

On January 28, 2013, Ms. Moradnejad attended an IEP meeting along with Mr. Reimer, Ms. Porcelli, who also served as the assessment evaluator, Ms. Tandle, Ms. McAlee, and a school representative, Caryn White. Id. at 235. At the meeting, a new IEP was developed for P.X. that maintained the same amounts of prescribed services as set forth in the April 12, 2012, IEP, but made revisions to some of his IEP goals. Id. at 212–31. The communication/speech and language goals adopted in the new IEP were not identical to the ones proposed by Ms. Moradnejad in her January 22, 2013, email, but four of the six proposed goals were incorporated in similar form. See id. at 212–29, 717. Further, all three math goals recommended by Ms. Moradnejad in her email were incorporated into the revised IEP. See id. at 212–29, 715. Mr. Reimer testified at the administrative due process hearing that while Ms. Moradnejad expressed concerns at the meeting about doing what was best for P.X., she never stated that the January 28, 2013, IEP provided an inappropriate setting for him. Id. at 1217.

Under the January 28, 2013, IEP, P.X.'s academic progress from the first half of the year continued. Mr. Reimer observed continued development, id. at 1219, and P.X.'s April 12, 2013, IEP progress report indicated that P.X. was progressing on almost all of his IEP goals, had mastered two of his goals, and made no progress on only one of his goals, id. at 244–50. Reflecting on the progress P.X. made over the course of the school year, Ms. Porcelli testified at the administrative due process hearing that at the beginning of the school year, P.X. maintained only limited verbal output, but by the end of the school year, P.X. had made slow, steady progress in greeting people, labeling, and making requests. Id. at 1314.

### F. School Transfer

On February 27, 2013, Ms. Moradnejad requested that Mr. Reimer and Megan Gregory-Morley, the Interim Program

Manager of Autism Support Services at the DCPS Office of Special Education, set up a time to discuss P.X. and what the best educational placement for him would be in the 2013–2014 school year. Id. at 736. On March 12, 2013, Mr. Reimer emailed Ms. Moradnejad stating that he and Ms. Gregory–Morley had met and discussed "the amount of time that [P.X.] is benefitting from instruction in the general education classroom, and what kind of a teaching arrangement would benefit him." Id. at 739. Both Mr. Reimer and Ms. Gregory–Morley agreed that P.X. "[grew] a lot in social and verbal interactions with adults and peers" and that he "need[s] exposure to peers whose social and verbal interactions are a model for him." Id. However, the two also agreed that P.X. "benefits from a highly structured classroom with a lot of visual supports" and from "very small group and one-on-one instruction," but that such individualized support was "challeng[ing]" given the demanding needs of many students at Walker Jones. Id. The two discussed placements for P.X. "in autism classrooms with dedicated time for mainstreaming" to ensure that P.X. would continue the combination of special instruction hours inside the general education setting and education in a more structured environment. Id. Ms. Moradnejad responded to Mr. Reimer's email, stating, "I'm on the same page as you guys." Id. at 740.

At a May 24, 2013, IEP meeting, Ms. Moradnejad requested that P.X. be placed in a self-contained autism-focused classroom at Hearst Elementary School for the upcoming 2013–2014 school year. Id. at 251. To reflect Ms. Moradnejad's requested placement for P.X., his IEP was amend-ed by increasing the amount of specialized instruction outside the general education classroom to 20.5 hours per week and by altering his IEP goals. Id. at 271. On July 12, 2013, DCPS sent a letter to Ms. Moradnejad informing her that P.X.'s location of services for the 2013–2014 school year would be at Hearst. Id. at 318. At the time this suit was brought, P.X. remained enrolled at Hearst. Compl. at 3.

## G. Administrative Due Process Complaint

On January 22, 2014, Plaintiffs filed an administrative due process complaint alleging that DCPS had denied P.X. a FAPE by failing to develop an IEP "that was reasonably calculated to enable P.X. to be involved in and make progress in the general education curriculum." AR 420. In particular, Plaintiffs alleged that the April 12, 2012, and January 28, 2013, IEPs inappropriately changed P.X.'s "least restrictive environment" from a full-time, self-contained autism classroom to a general education setting. Id. Plaintiffs also alleged that P.X.'s January 14, 2014, IEP, developed while P.X. was at Hearst, inappropriately reduced P.X.'s speech and language services and failed to include "writing" as an area of concern for P.X. Id. at 423.[4] As relief, Plaintiffs requested that DCPS be ordered to: (1) fund a private-school placement for P.X., including transportation costs; (2) revise P.X.'s IEP to include, at minimum, ninety minutes per week of direct speech and language therapy services in the school setting; (3) revise P.X.'s IEP to include written expression as an area of concern and develop for him "age-appropriate" writing goals;[5] (4) fund reasonable

---

4. As noted above in footnote 2, Plaintiffs do not challenge this IEP in this Court and it will not be addressed herein.

5. During the administrative due process hearing, Plaintiffs withdrew this request for relief because a March 7, 2014, IEP included written expression as an area of concern for P.X.

compensatory education for the alleged IDEA violations; and (5) pay Plaintiffs' reasonable attorney's fees and costs incurred in the administrative proceedings. Id. at 424–25.

## H. Administrative Due Process Hearing

An administrative due process hearing was held on March 24, March 26, and April 4, 2014. Id. at 4–5. Plaintiffs presented five witnesses: Ms. Moradnejad; Lindsay Hart, P.X.'s private pediatric speech-language pathologist at Georgetown University Hospital, who was qualified as an expert in speech-language pathology; Stephanie de-Sibour, the Assistant Director and Director of Admissions at The Ivymount School and Programs;[6] Mia Long, an educational advocate; and Meridith McLane, P.X.'s private occupational therapist at Georgetown University Hospital, who was qualified as an expert in occupational therapy. Id. at 6. Defendant also presented five witnesses: Stephanie Aduso, P.X.'s special education teacher at Walker Jones during the 2011–2012 school year; Deborah Bergeron, the principal at Hearst Elementary School; Lori Porcelli, P.X.'s speech-language pathologist at Walker Jones during the 2012–2013 school year; Neil Reimer, P.X.'s special education teacher at Walker Jones during the 2012–2013 school year; and Mary Ball, P.X.'s special education teacher at Hearst Elementary School during the 2013–2014 school year. Id.[7]

Ms. Moradnejad testified that her son made little progress under the April 2012 and January 2013 IEPs. Id. at 907–15. She claimed that during the 2010–2011 school year, when he was initially placed in a general education setting, he began to experience regression. Id. She testified that his teachers told her that P.X. was "lost" and "making no progress." Id. at 907. She further testified that, in her view, P.X. had not made progress in his ability to speak or hold a pencil or paintbrush. Id. at 908. Likewise, she testified that she felt that P.X. lost his ability to understand structure, that his focus was terrible, and that he made no progress on strengthening his hands. Id. at 914–15. According to Ms. Moradnejad, the transition to a general education setting was a "disaster." See id. Ms. Moradnejad claimed that under the challenged IEPs, P.X.'s progress continued to stall. Id. at 927–45. In kindergarten, Ms. Moradnejad asserted, P.X. continued to suffer from lack of focus caused by the dearth of individual attention he needed. See id.

Ms. Moradnejad further claimed that she did not consent to the April 2012 and January 2013 IEPs. She stated that during the April 12, 2012, IEP meeting, when the team discussed moving P.X. into the general education setting, she was told, "[t]hat's where he's going" by Ms. Aduso. Id. at 927. According to Ms. Moradnejad, decisions regarding P.X.'s academic placement were effectively made without her input because she simply went along with what the school said. Id. at 927–30. Ms. Moradnejad further testified that she "didn't understand what [self-contained]

---

and added "age appropriate" goals in that area. AR 854.

**6.** The Ivymount School and Programs is a private school in Rockville, Maryland that has an autism program which serves students aged six to twenty-one with one-to-one, two-to-one, or small group instruction. See id. at 1055–64.

**7.** Some of these witnesses testified about the appropriateness of P.X.'s placement and services at Hearst, which is not at issue in this case. See supra note 4. Only the testimony relevant to the claims made in this Court is summarized below.

meant" at the time of the April 12, 2012, IEP meeting and that it "never came up" when discussing P.X.'s kindergarten services. Id. at 928.

Stephanie Aduso, P.X.'s pre-kindergarten special education teacher for the 2011–2012 school year, testified that the goals set forth in P.X.'s April 2012 IEP were formulated based on classroom assessments, anecdotal notes from the general education teacher and three classroom assistants, and her own observations from working with P.X. during the school year. Id. at 1354–55. The goals were also based on P.X.'s level of independence, the services he needed for transitions, and observed peer interactions. Id. at 1356. Ms. Aduso stated that P.X. was able to navigate the pre-kindergarten schedule independently with some verbal prompts and that he benefitted from the inclusion model. Id. at 1377, 1384. She also testified that P.X. was motivated to be with his classmates, to interact with them, and to share experiences with them. Id. at 1365. According to Ms. Aduso, it was important for P.X. to be in a general education setting because he could model the social interactions and language of his non-disabled peers. Id. at 1357–58. She also testified that Ms. Moradnejad never requested an out-of-general-education setting for P.X.'s kindergarten school year. Id. at 1357.

Neal Riemer, P.X.'s kindergarten special education teacher, has a master's degree from George Washington University in early childhood special education and has previously taught autistic students in kindergarten through the second grade. Id. at 1181–83, 1185. He testified that during the 2012–2013 school year, he implemented the goals in P.X.'s April 2012 and January 2013 IEPs. Id. at 1187. According to Mr. Reimer, three-quarters of the time there were at least three adults in P.X.'s classroom working with the students. Id. at 1206. He opined that at Walker Jones, P.X. was located in an inclusion classroom in a general education setting and was not in a self-contained classroom. Id. at 1201–02. Mr. Riemer stated that he provided pull-out services to P.X., that he provided specialized instruction on P.X.'s IEP goals, id. at 1186, 1203, that he worked closely with P.X.'s speech-language therapist and occupational therapist, id. at 1203, and that P.X. had the opportunity to model behaviors and social skills because he was paired with a non-disabled general education student, id. at 1207, 1265.

Mr. Riemer testified that P.X. improved in many areas during his kindergarten school year, including: counting objects, verbal expression, writing skills, socialization, organization, and independence. Id. at 1194, 1197, 1199–1201, 1208, 1210, 1278. In Mr. Reimer's opinion, the inclusion setting was appropriate for P.X. because he was able to engage with non-disabled peers; additionally, Mr. Reimer observed that P.X. could follow activities and understand what was going on around him in the inclusion setting. Id. at 1213, 1218.

Lori Porcelli, a DCPS speech-language pathologist, testified that she provided pull-out speech and language services for P.X. during his kindergarten school year, two or three times per week. Id. at 1308–09, 1315. When she provided services to P.X., she sometimes saw him one-on-one and other times saw him with one or two other students, depending on which IEP goal she was working on. Id. at 1316. She also testified that although P.X. had a limited verbal output at the beginning of the school year, he made "slow and steady progress" in greeting people, labeling, and requesting. Id. at 1314. She further testified that at the beginning of the school year, P.X. could only stick with an activity for about two minutes without prompting, but by the end of the school year that time

had increased to ten minutes. Id. at 1324. Ms. Porcelli stated that for P.X.'s January 2013 IEP, the goals she helped draft were based on service logs, observations, progress reports, information from Early Stages reports, and parental input. Id. at 1317–18, 1320. Ms. Porcelli opined that P.X. made progress in speech and language during his kindergarten school year and that the amount of progress he made was appropriate given his disability. Id. at 1312, 1342–43.

Lindsay Hart, P.X.'s pediatric speech-language pathologist, was qualified as an expert in speech and language pathology by the hearing officer and testified that she began working with P.X. in April 2012. Id. at 990, 993. She met with P.X. once a week for one-hour sessions. Id. at 993–94. She testified that she had "always seen progress with [P.X.] in [her sessions]." Id. at 1012. She also testified that P.X. worked best in one-on-one sessions and did not perform as well with others in the room because he was easily distracted. Id. at 1001. She recommended that P.X.'s educational setting be a small, structured classroom with minimal distractions, with verbal peers who would help improve P.X.'s social skills. Id. at 1004–05.

Mia Long, P.X.'s educational advocate, testified that she conducted a forty-minute observation of P.X. in her office on December 30, 2013. Id. at 1089–90, 1095, 1098. During that observation, she tested P.X. on some of the goals in his IEP to see if he could perform them. Id. at 1097. She testified that P.X. demonstrated a mastery of some of the goals, that he did well putting items in patterns, and that he was able to identify letters. Id. at 1096–99. She also testified that his attention and focus were poor during the evaluation. Id. at 1098. She expressed concern that P.X. was "still working on pre-academic skills" which had been carried over from year to year in his

IEPs. Id. at 1099–1101. Ms. Long recommended that P.X.'s location of services be a full-time special education environment with a small student-teacher ratio. Id. at 1118. She opined that she believed P.X.'s placement in a general education setting was inappropriate given his limitations. Id. at 1115–16.

At the due process hearing, Plaintiffs also presented the results of private evaluations of P.X. that Ms. Moradnejad had conducted in March and October 2013. Id. at 242, 348. The evaluators concluded that P.X. requires a classroom with a small student-teacher ratio and a small, highly structured, self-contained environment. Id.

## I. Hearing Officer's Determination

On April 22, 2014, the hearing officer issued her HOD, finding that Plaintiffs had not met their burden to prove that DCPS denied P.X. a FAPE by failing to place P.X. in a self-contained special education classroom during the 2011–2012 and 2012–2013 school years. Id. at 11–15. On that claim, the hearing officer found "nothing inappropriate about the IEPs or the inclusions [sic] settings wherein [P.X.] received his education during the 2011/12 and 2012/13 school years." Id. at 13. The hearing officer reached this conclusion even though P.X. was, at the time of her decision on April 22, 2014, placed in a self-contained, full-time autism program at Hearst which "appear[ed] to be meeting [his] needs." Id.

The hearing officer reasoned that, under the challenged IEPs, P.X. "learned to socialize with typically developing peers" and that "[P.X.'s] vocalization increased as a result of being educated with typically developing peers." Id. She further explained that P.X. "demonstrated more engagement and academic benefit from being in the general education setting" than did P.X.'s peers who were primarily educated in a

self-contained classroom and were only "pushed into" the general education setting for morning meetings. Id. Although Ms. Moradnejad felt that P.X. should have always been placed in a full-time, self-contained autism classroom, the hearing officer found that her views were "speculative at best" and were undermined by the record evidence demonstrating P.X.'s significant progress under the challenged IEPs. Id. Indeed, the hearing officer concluded that P.X. derived benefit from the general education setting since even now, in his full-time autism program at Hearst, he "has no problems interacting with his typically developing peers" when that situation arises. Id. "And isn't that the entire point of IDEA?" the hearing officer rhetorically asked, "[t]o educate the child in the least restrictive environment with supports and accommodations that will enable the child to derive benefit from the curriculum?" Id. The hearing officer found that P.X. "was able grow, learn and achieve in the inclusion setting ... commensurate with his abilities," even though his growth was slower than his typically developing peers. Id. In sum, the hearing officer concluded that "[P.X.] received educational benefit through the implementation of [the challenged] IEPs." Id.

The hearing officer also found that the April 12, 2012, and January 28, 2013, IEPs were "developed and implemented with the full cooperation and consent of [Ms. Moradnejad]." Id. at 14. According to the hearing officer, Ms. Moradnejad's testimony that she simply went along with whatever educators at Walker Jones offered during IEP meetings was not credible. Id. "[Ms. Moradnejad] was articulate, vocal with educators, spoke with educators on a daily basis, was in [P.X.'s] classroom on a daily basis, and, by her own testimony, 'would breathe down someone's neck until she got the information she wanted.'" Id. Ms. Moradnejad was "not hesitant about convening a meeting to discuss her child's education." Id. at 12. The hearing officer also did not believe Ms. Moradnejad's assertion that she did not know what a self-contained classroom was at the time of the April 12, 2012, and January 28, 2013, IEP meetings. Id. at 14. According to the hearing officer, "without a doubt, [Ms. Moradnejad] knew what a self-contained classroom was. After all, [P.X.] had been in a self-contained classroom before and one existed right next door to [P.X.'s] [k]indergarten classroom." Id. The hearing officer found that Ms. Moradnejad's cooperation with the IEP team and her understanding of P.X.'s needs and services bolstered the conclusion that his challenged IEPs were appropriate. See id.

### J. Plaintiffs' District Court Complaint

Before this Court, Plaintiffs appeal the hearing officer's decision that P.X. was not denied a FAPE because the April 12, 2012, and January 28, 2013, IEPs, were not inappropriate. Compl. at 8–9.[8] Those IEPs, Plaintiffs assert, were inappropriate because they failed to provide P.X. with education in a "self-contained, out of general education setting, which he required to receive educational benefit." Id. at 9. Plaintiffs further argue that the HOD was based on the erroneous findings that P.X. derived educational benefit from the inclusion setting, that Ms. Moradnejad was in agreement with the two IEPs in question at the time they were developed, and that Ms. Moradnejad knew a fully self-contained placement was an option she could have requested for P.X. Id. at 9–10. Plain-

---

8. As explained above, Plaintiffs did not raise the issue regarding the January 14, 2014, IEP in this Court. See supra note 4.

tiffs request that the Court: (1) reverse the April 22, 2014, HOD and find that P.X. was denied a FAPE; (2) order Defendant to provide P.X. with compensatory education; and (3) award Plaintiffs attorney's fees and costs they incurred in litigating this action.

## LEGAL STANDARDS

### A. Summary Judgment

■ Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In IDEA cases such as this one, where a court is reviewing a hearing officer's determination, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id. § 1415(i)(2)(C). When no additional evidence beyond the administrative record has been introduced, as is the case here, a motion for summary judgment operates as a motion for judgment based on the administrative record. Dist. of Columbia v. Ramirez, 377 F.Supp.2d 63, 67 (D.D.C.2005).

### B. Reviewing an HOD Pursuant to the IDEA

■ The IDEA guarantees children with disabilities the right to a free appropriate public education. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1). The primary vehicle for ensuring that students identified as disabled receive a FAPE is the creation and implementation of an IEP setting forth the services to be provided to meet that student's needs. Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (describing the IEP as the "modus operandi" of the IDEA); 20 U.S.C. § 1414(d)(1)(A)-(2)(A). The plan is developed by the student's IEP team, which includes the student's parents, teachers, and other educational specialists. 20 U.S.C. § 1414(d)(1)(B). An IEP contains assessments of the student's needs, strategies to meet those needs, and goals used to measure the effectiveness of the plan. Id. § 1414(d)(1)(A). The IEP team must develop an IEP that is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 204, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The IDEA also requires that children with disabilities be placed in the "least restrictive environment" so that they can be educated in an integrated setting with children who do not have disabilities to the maximum extent appropriate. See 20 U.S.C. § 1412(a)(5)(A). Once a child has been identified as disabled, the school district must review and revise the student's IEP periodically, and at least annually, to determine whether the child's goals are being achieved. Id. § 1414(d)(4)(A)(i)-(ii). If appropriate educational services cannot be provided by the school district, the IDEA requires that the student be placed in a private school at public expense. Id. § 1413(a)(4).

■ A parent dissatisfied with the substance or implementation of his or her child's IEP may request an administrative due process hearing before an independent hearing officer. Id. § 1415(f)(1). If the parent is "aggrieved by" the hearing officer's determination, the parent may seek judicial review of the HOD in the district court. Id. § 1415(i)(2). The reviewing court, "basing its decision on the prepon-

derance of the evidence, shall grant such relief as the court determines is appropriate." Id. § 1415(i)(2)(C). The burden of proof falls upon the party challenging the HOD, who must " 'at least take on the burden of persuading the court that the hearing officer was wrong.' " Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 521 (D.C.Cir.2005) (quoting Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C.Cir. 1988)).

The IDEA's preponderance of the evidence standard does not authorize unfettered de novo review and is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206, 102 S.Ct. 3034. Rather, courts must give "due weight" to the administrative findings since "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' " Id. (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). Indeed, " '[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.' " Dixon v. Dist. of Columbia, 83 F.Supp.3d 223, 234 (D.D.C. 2015) (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 382 (2d Cir.2003)). Put simply, courts may not substitute their own views for those of the hearing officer. See Rowley, 458 U.S. at 206, 102 S.Ct. 3034. At the same time, however, the IDEA suggests that " 'less deference than is conventional' in administrative proceedings" is appropriate, since the district court is allowed to hear additional evidence at the request of a party. Reid, 401 F.3d at 521 (quoting Kerkam, 862 F.2d at 887); 20 U.S.C. § 1415(i)(2)(C)(ii). Moreover, "a hearing decision 'without reasoned and

specific findings deserves little deference.' " Reid, 401 F.3d at 521 (quoting Kerkam, 862 F.2d at 887).

## DISCUSSION

Plaintiffs contend that the April 12, 2012, and January 28, 2013, IEPs were inappropriate in that they failed to provide P.X. with education in a self-contained classroom outside of the general education setting. Pl. Mot. at 9–11, 14–22. Plaintiffs further argue that the HOD was based on erroneous findings, including: (1) that P.X. derived educational benefit from the inclusion setting; (2) that Ms. Moradnejad was in agreement with the challenged IEPs when they were adopted; and (3) that Ms. Moradnejad knew that a fully self-contained setting was an option she could have requested for P.X. Id. at 11–18. Defendant counters that the challenged IEPs were appropriate because they conferred educational benefit on P.X. Def. Mot. at 18–25. Defendant relies primarily on testimony from P.X.'s teachers and the findings in various IEP progress reports. See id. Defendant also challenges Plaintiffs' assertion that the HOD was based on erroneous findings. Id. The undersigned first considers Plaintiffs' claim that P.X. was denied a FAPE by way of inappropriate IEPs before considering their assertion that the hearing officer erred in her factual findings.

### A. Appropriateness of the April 2012 and January 2013 IEPs

Plaintiffs first challenge the April 2012 and January 2013 IEPs as inappropriate. The Supreme Court explained in Rowley that a court's assessment of an IEP involves two inquiries:

First, has the State complied with the procedures set forth in the [IDEA]? And second, is the [IEP] developed through the [IDEA's] procedures reasonably cal-

culated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Rowley, 458 U.S. at 206–07, 102 S.Ct. 3034. Courts have consistently underscored that the "appropriateness of an IEP is not a question of whether it will guarantee educational benefits, but rather whether it is reasonably calculated to do so." K.S. v. Dist. of Columbia, 962 F.Supp.2d 216, 221 (D.D.C.2013) (citing Thompson R2–J Sch. Dist. v. Luke P. ex rel. Jeff P., 540 F.3d 1143, 1148–49 (10th Cir.2008)); Rowley, 458 U.S. at 200, 102 S.Ct. 3034 (finding that the IDEA does not require that IEPs "maximize the potential of each handicapped child commensurate with the opportunity provided non-handicapped children," only that they be "reasonably calculated to enable the child to receive educational benefits"); N.T. v. Dist. of Columbia, 839 F.Supp.2d 29, 33 (D.D.C.2012) ("While the District of Columbia is required to provide students with a public education, it does not guarantee any particular outcome or any particular level of education.").

 " [B]ecause the question . . . is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so, . . . the measure and adequacy of an IEP can only be determined as of the time it is offered to the student. . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement.' " S.S. ex rel. Shank v. Howard Rd. Academy, 585 F.Supp.2d 56, 66 (D.D.C.2008) (quoting Thompson, 540 F.3d at 1149). As such, "the court judges the IEP prospectively and looks to the IEP's goals and methodology at the time of its implementation."

K.S., 962 F.Supp.2d at 221. Further, a child's academic progress under a challenged IEP can be relevant in determining the appropriateness of that IEP. Roark ex rel. Roark v. Dist. of Columbia, 460 F.Supp.2d 32, 44 (D.D.C.2006) ("Academic success is an important factor 'in determining whether an IEP is reasonably calculated to provide education benefits.' ") (quoting Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir.2003)).

Accordingly, the undersigned considers the context in which the April 12, 2012, and January 28, 2013, IEPs were formulated and the information considered at the time of each meeting—specifically, P.X.'s academic progress.

### 1. Context and Development of the April 12, 2012, IEP

Leading up to the April 12, 2012, IEP meeting, P.X. was in pre-kindergarten at Walker Jones, receiving the bulk of his specialized instruction in the general education classroom. AR 13. The general education classroom was comprised of approximately eighteen children, nine of whom had IEPs. Id. at 919. The class was led by a general education teacher, a special education teacher, and three assistant teachers. Id. at 1370. P.X.'s special education teacher at the time, Ms. Aduso, testified at the administrative due process hearing that, at the start of the 2011–2012 school year, P.X. was not communicating verbally at the same level as his general education peers and needed support and prompting to communicate through speaking. Id. at 1379. Ms. Moradnejad, too, was concerned by P.X.'s vocalization delays. See id. at 918, 921.

The hearing officer found that although P.X. was developing at a rate slower than his non-disabled peers, he made progress during the 2011–2012 school year. Id. at 14. For example, a January 30, 2012, IEP progress report indicated that P.X. had

mastered many of his IEP goals and made progress on most others. Id. at 137–42. Indeed, he failed to progress on only one goal. Id. Ms. Aduso observed that during the 2011–2012 school year, P.X. was benefitting from the inclusion model, id. at 1377, and that he was very motivated to be with his classmates and interact with them in the general education environment, id. at 1365.

It is within the context of these successes, delays, and projected challenges that P.X.'s April 12, 2012, IEP was developed. On April 12, 2012, P.X.'s IEP team met and reviewed his classroom-based assessments, discussed classroom observations and anecdotal notes, and reviewed a preschool language scale assessment, progress reports, and several formal assessments. Id. at 152, 1354–55. The IEP team discussed P.X.'s skills, strengths, and needs. Id. at 1357. The IEP team determined that it was important for P.X. to maintain time in the general education environment to work on his social interactions and develop his pragmatic and social language skills. Id. at 1362, 1364–65. This inclusion model would allow P.X. to model off of his typically developing peers, id. at 1358, which, when paired with modifications in the general education environment, would help P.X. develop social and vocalization skills, id. at 1362. However, because both Ms. Aduso and Ms. Moradnejad felt that in kindergarten, P.X. would need more assistance with academics, id. at 927, 1384, the April 2012 IEP increased his specialized instruction outside of the general education environment and decreased his specialized instruction inside the general education setting. Id. at 163.

### 2. Context and Development of the January 28, 2013, IEP

Similarly, the undersigned reviews the January 28, 2013, IEP prospectively, bearing in mind P.X.'s academic progress during the first half of the 2012–2013 school year. Consistent with the April 12, 2012, IEP, a primary focus during P.X.'s kindergarten year was building his social and vocalization skills through the use of special education in the general education setting, which allowed P.X. to model off of typically developing peers. Id. at 1192, 1198. The makeup of the general education class was similar to that of the pre-kindergarten classroom. Id. at 9. It was comprised of eighteen children—about half of whom had IEPs—led by a general education teacher, a special education teacher, and two classroom aides. Id.

Mr. Reimer, P.X.'s kindergarten special education teacher, noted that P.X. initially presented as having a "profound communication delay." Id. at 1191–92. But in the general education environment, P.X. benefitted from peer modeling and demonstrated engagement and academic benefit from being in that environment. Id. at 1199, 1207–08, 1215. By mid-year, P.X. was "making a lot of improvements" in his social interactions, and his level of verbal expression went from "one spoken word in a very, very quiet voice" to "multiple words [and] phrases." Id. at 1199. When P.X. was not in the general education environment, he was receiving individualized instruction with Mr. Reimer, Ms. Porcelli, or Ms. Tandle. Id. at 1203. These pull-out services combined academics with language and fine motor skills goals. Id. P.X.'s communication skills progressed and he required fewer verbal prompts to complete tasks. Id. at 1209–11. He developed spontaneous communication abilities which he lacked at the beginning of the school year, id. at 1210, and was showing "consistent progress" in math and reading, id. at 1200. Further, the June 11, 2012, and November 9, 2012, IEP progress reports showed that P.X. was making progress on

most of his IEP goals. Id. at 175–81, 203–09.

Despite this progress, Ms. Moradnejad was concerned that P.X. had not yet mastered IEP goals from previous school years. Id. at 959. She emailed Mr. Reimer, Ms. Porcelli, and Ms. McAlee, outlining her concerns and suggesting how P.X.'s IEP goals could be changed to better help him prepare for the first grade. Id. at 715. The team incorporated most of her proposed goals into the January 28, 2013, IEP, and Ms. Moradnejad expressed no dissatisfaction with the new goals or P.X.'s placement under the January 2013 IEP. See id. at 212–29, 717.

Under the January 28, 2013, IEP, P.X.'s academic progress from the first half of the year continued. Mr. Reimer observed continued development, id. at 1219, and P.X.'s April 12, 2013, IEP progress report indicated that P.X. was progressing on almost all of his IEP goals, id. at 244–50. Ms. Porcelli testified that at the beginning of the 2012–2013 school year, P.X. maintained only limited verbal output, but by the end of the school year, P.X. had made "slow and steady progress" in greeting people, labeling, and making requests. Id. at 1314.

3. Appropriateness of the April 12, 2012, and January 28, 2013, IEPs

On this record, the undersigned concludes that the hearing officer did not err in finding that P.X. was making social and academic progress at the time of both the April 12, 2012, and January 28, 2013, IEP meetings, and that P.X. continued to make social and academic progress while those IEPs were in effect. Plaintiffs' assertion to the contrary relies heavily on Ms. Moradnejad's own testimony. Specifically, she testified that she observed "regressions" during the school year, id. at 959, 963, that she was frustrated by P.X.'s inability to master all of his IEP goals, id. at 959, and

that she believes P.X. would have been better off in a more restrictive learning environment, Compl. at 9.

Beyond Ms. Moradnejad's own testimony, Plaintiffs also rely on the testimony of Mia Long and Lindsay Hart and the results of privately conducted evaluations to argue that P.X. could have made more academic gains in a more restrictive environment. See id. at 8; Pl. Mot. at 18–22. Ms. Long, a former special education teacher who is also an employee of Plaintiffs' attorney's law firm, AR 1090, testified that she did not think P.X.'s placement in the general education classroom was reasonable or appropriate, id. at 1115. Ms. Long based her conclusion on her review of P.X.'s IEP and IEP progress reports, conversations with Ms. Moradnejad, and a forty-minute observation she had with P.X. on December 31, 2013, over nineteen months after the April 12, 2012, IEP meeting and over eleven months after the January 28, 2013, IEP meeting. Id. at 1095–96, 1098.

Ms. Hart is a private speech therapist who began working with P.X. once a week beginning in April 2012. Id. at 993–94. Though she has never worked in a school setting, id. at 993, and did not take part in either the April 2012 or January 2013 IEP meetings, id. at 1006, Ms. Hart recommended that P.X. be placed in a small, structured classroom, id. at 1005. She also noted, however, the importance of P.X. spending time with verbal peers who could act as peer models. Id. Further, Plaintiffs rely on the conclusions of private evaluations of P.X. that Ms. Moradnejad had conducted in March and October 2013, well after the April 2012 and January 2013 IEP meetings. Id. at 242, 348. The evaluators concluded that P.X. requires a classroom with a small student-teacher ratio and a small, highly structured, self-contained environment. Id.

None of Plaintiffs' evidence provides adequate ground on which to overturn the hearing officer's decision. First, the hearing officer weighed the evidence available to her and arrived at the reasoned conclusion that P.X. was making satisfactory progress under his IEPs. This Court has held that "where evidence of educational appropriateness is mixed, and a court bases its ruling on [the] same record as [was considered by] the hearing officer, the court should defer to the hearing officer." Schoenbach v. Dist. of Columbia, 309 F.Supp.2d 71, 82 (D.D.C.2004). The undersigned concludes here that deference to the hearing officer is appropriate because she made reasoned, specific findings on the adequacy of the IEPs in question. Turner v. Dist. of Columbia, 952 F.Supp.2d 31, 37 (D.D.C.2013) (declining to overturn a hearing officer's determination where the findings were "reasoned and specific"); Phillips ex rel. T.P. v. Dist. of Columbia, 932 F.Supp.2d 42, 50 (D.D.C. 2013) (upholding hearing officer's conclusions as "reasoned and specific" where the hearing officer "specifically considered all of the submitted evidence in her final opinion," and "made detailed factual findings" which were supported by the record). The hearing officer's thorough decision in this case far exceeds the "one-sentence ipse dixit" the Court of Appeals overturned in Reid. Reid, 401 F.3d at 521.

This Court's decision in J.N. v. District of Columbia, 677 F.Supp.2d 314, 322–23 (D.D.C.2010), is instructive. There, like here, the plaintiff argued that her child's IEP was inappropriate based in large part on her own testimony regarding his lack of educational progress. Id. at 323. She also relied on several psycho-educational evaluations showing that the child's test scores were declining and on the testimony of an administrator at a local private school, who testified that the private school would be an appropriate placement for the child. Id.

The Court found that although the evidence the plaintiff presented did tend to support her argument, it was "not conclusive." Id. Instead, the Court deferred to the hearing officer, who had found that DCPS' evidence of the child's progress under the challenged IEP was more persuasive. Id. That evidence included testimony from educators who had personal knowledge of the student and who testified that he was making educational progress. Id.

Here, like in J.N., the hearing officer relied on substantial record evidence supporting the conclusion that P.X. was receiving educational benefit under his challenged IEPs. This evidence included IEP progress reports and the testimony of many of P.X.'s teachers. These educators had first-hand experience with P.X. in the classroom and therefore could be expected to know whether his IEPs were sufficient to address his educational needs. All testified that he was progressing under the challenged IEPs. While Plaintiffs' evidence does tend to support their argument that a general education setting was inappropriate, the undersigned cannot, on this record, gainsay the hearing officer's carefully reasoned decision that Plaintiffs were wrong. Indeed, although Ms. Moradnejad claims that P.X.'s teachers told her that P.X. was "lost" and "making no progress," AR 907, these hearsay statements appear to be Ms. Moradnejad's interpretation of what she heard. Certainly the teachers' own testimony at the administrative due process hearing contradicts Ms. Moradnejad's version of events. Likewise, although Ms. Moradnejad described the general education environment as a "disaster" for P.X., id. at 914–15, the testimony of his teachers and the progress demonstrated under the challenged IEPs belies that assertion.

Although Ms. Moradnejad testified that she had concerns about whether P.X. was receiving the special education services he needs, an IEP "need not conform to a parent's wishes in order to be sufficient or appropriate." K.S., 962 F.Supp.2d at 221; Shaw v. Dist. of Columbia, 238 F.Supp.2d 127, 139 (D.D.C.2002) (the IDEA does not provide that an education be "designed according to the parent's desires"). While the undersigned is sensitive to Ms. Moradnejad's desire for P.X. to have had more individualized services than those prescribed in his April 2012 and January 2013 IEPs, when an IEP meets the IDEA's requirements, this Court can ask no more of DCPS. See K.S., 962 F.Supp.2d at 221; Rowley, 458 U.S. at 206–07, 102 S.Ct. 3034.

Further, neither the opinions of Ms. Long and Ms. Hart nor the private evaluation results were considered at the April 12, 2012, or January 28, 2013, IEP meetings, and nothing in the IDEA requires that they should have been. See 34 C.F.R. § 300.324 (setting forth considerations for development and revision of IEPs, including "recent" evaluation results); id. § 300.305 (requiring an IEP team to consider outside evaluations and information if provided by a student's parent). When presented in hindsight, as they are here, to argue that P.X. would have made better academic progress in a different educational placement, these opinions and evaluation results are minimally relevant to the Court's task. The undersigned may not engage in "Monday Morning Quarterbacking" by speculating about whether P.X. would have made more academic progress in a different environment. See S.S., 585 F.Supp.2d at 66. The hearing officer stated that while P.X. did not advance at the same rate as his typically developing peers, P.X.'s rate of growth and learning was commensurate with his abilities, which is consistent with the requirements of the IDEA. AR 12; Rowley, 458 U.S. at 198–99, 102 S.Ct. 3034 (the IDEA does not require absolute equality in education provided to disabled and non-disabled students, only education appropriate to the child's capacity). As a result, Plaintiffs' expert testimony and proffered evaluations are insufficient to undermine the hearing officer's conclusions.

Further, it is important to note that, in addition to the IDEA requirement that IEPs be "reasonably calculated to enable the child to receive educational benefits," id. at 206–07, 102 S.Ct. 3034, the IDEA also requires that children with disabilities be placed in the "least restrictive environment" ("LRE"). 20 U.S.C. § 1412(a)(5)(A). This means that children with disabilities must be educated in an integrated setting with children who do not have disabilities to the maximum extent appropriate. Id. "Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment" should occur only if "the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2)(ii); see also Roark, 460 F.Supp.2d at 43 (noting that "mainstreaming" of children eligible for special education services under the IDEA is "not only a laudable goal but is also a requirement of the Act"); Rowley, 458 U.S. at 202, 102 S.Ct. 3034 ("The [IDEA] requires participating States to educate handicapped children with nonhandicapped children whenever possible.").

Through his April 2012 and January 2013 IEPs, P.X. received educational services both in a general education environment and in a more restrictive environment. Plaintiffs assert that the general

education environment, in which P.X. spent much of his time during the 2012–2013 school year, was an inappropriate LRE. Pl. Mot. at 11. This assertion is, again, heavily reliant on Ms. Moradnejad's own testimony, as well as the testimony of Ms. Hart and Ms. Long and the private evaluation results. Id. The hearing officer, however, correctly found that, consistent with the LRE mandate, P.X. was provided support and accommodations to make his time within the general education environment beneficial. AR 13. And, as previously discussed, P.X. did in fact receive educational benefit in the inclusion setting. Id. When he was placed in an inclusion setting under the challenged IEPs, educators fostered social relationships between P.X. and his peers, id. at 1207, while also working with P.X. to become more independent, id. at 1200. For more narrowly tailored academic support, P.X. was provided pull-out services. Id. at 1202–04. As a result, P.X. "demonstrated more engagement and academic benefit from being in the general education setting" than did P.X.'s peers who were primarily in the self-contained classroom and only "pushed into" the general education setting for morning meetings. Id. at 13. As the hearing officer found, "the entire point of IDEA . . . [–][is] [t]o educate the child in the least restrictive environment with supports and accommodations that will enable the child to derive benefit from the curriculum[.]" Id. The undersigned finds no reason to disturb the hearing officer's well-reasoned and supported determination that P.X.'s April 12, 2012, and January 28, 2013, IEPs were formulated in accordance with the IDEA's LRE mandate.

▉ Indeed, implicit in Plaintiffs' Complaint is an invitation for the Court to impose upon DCPS its preferred notions of educational policy. However, " '[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.' " Dixon, 83 F.Supp.3d at 234 (quoting Grim, 346 F.3d at 382); see also Rowley, 458 U.S. at 206, 102 S.Ct. 3034 (a court's authority to review IDEA cases is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"). The hearing officer provided a detailed explanation of how the goals and strategies set forth in P.X.'s April 2012 and January 2013 IEPs were appropriate. Accordingly, the undersigned recommends that the Court find that Plaintiffs failed to show that the hearing officer erred in finding that the April 12, 2012, and January 28, 2013, IEPs were appropriate.

**B. Hearing Officer's Findings**

Beyond Plaintiffs' claim that the April 2012 and January 2013 IEPs were inappropriate, they also contend that the HOD was based on erroneous factual findings, including: (1) that P.X. derived educational benefit from the inclusion setting; (2) that Ms. Moradnejad was in agreement with the two IEPs in question at the time they were formulated; and (3) that Ms. Moradnejad knew a full-time, self-contained program was an option she could have requested for P.X. Compl. at 9. The undersigned addresses these findings in turn.

### 1. P.X. Received Educational Benefit from the April 12, 2012, and January 28, 2013, IEPs

Plaintiffs assert in their Complaint that during the 2012–2013 school year, Ms. Moradnejad did not observe any meaningful progress for P.X. and that P.X. failed to master his IEP goals. AR 422; Compl. at 9. Plaintiffs' assertion, however, is not supported by the administrative record. As previously discussed, P.X. made both social

and academic progress during the 2012–2013 school year. See supra Section A.3. Plaintiffs have not submitted any additional evidence on appeal to this Court to challenge the hearing officer's finding that P.X. made such progress. When no additional evidence beyond the administrative record has been introduced, as here, a motion for summary judgment operates as a motion for judgment based on the administrative record. 20 U.S.C. § 1415(i)(2)(B); Ramirez, 377 F.Supp.2d at 67. Having thoroughly reviewed the administrative record, the undersigned sees nothing to support the conclusion that the hearing officer erred in her determination that P.X. received educational benefit during the 2012–2013 school year. As shown above, Plaintiffs' near-total reliance on Ms. Moradnejad's own notions of P.X's needs are insufficient to contradict the other record evidence of his progress.

### 2. Ms. Moradnejad Consented to the April 12, 2012, and January 28, 2013, IEPs

Next, Plaintiffs argue that Ms. Moradnejad did not consent to the April 2012 and January 2013 IEPs when they were developed. The hearing officer, however, found that Ms. Moradnejad was "at the helm steering the services" provided to P.X., and that the IEPs were "developed and implemented with [her] full cooperation and consent." AR 12. In fact, Ms. Moradnejad participated in both the April 12, 2012, and January 28, 2013, IEP meetings. Id. at 925, 963. She was integrally involved on a continuing basis in the day-to-day educational services provided to P.X., see id. at 898–985, and, in her own words, would "breathe down your neck" until she got the information she wanted, id. at 974. Ms. Aduso, who was present at the April 12, 2012, IEP meeting, testified that Ms. Moradnejad never requested an out-of-general-education setting for P.X.'s kindergarten year. Id. at 1357, 1390. Leading up to the January 28, 2013, IEP meeting, Ms. Moradnejad suggested revisions to P.X.'s IEP goals, id. at 715, most of which were incorporated into the adopted IEP, see id. at 212–29, 716–18. Ms. Porcelli testified that the January 28, 2013, IEP goals were developed with parental input. Id. at 1317–18, 1320. Mr. Reimer testified that while Ms. Moradnejad expressed concerns about the adequacy of P.X.'s IEP goals during the January 28, 2013, meeting, Ms. Moradnejad never stated that she did not think the January 2013 IEP provided the appropriate setting for P.X. Id. at 1213, 1217.

While Ms. Moradnejad testified that decisions regarding P.X.'s academic placement were made without her input and that she simply went along with what the school said, id. at 927, the hearing officer did not find those assertions credible, id. at 12. "In IDEA cases, the hearing officer 'like the trier of fact in judicial proceedings, must weigh and interpret the evidence and ultimately make a finding[.]'" Roark, 460 F.Supp.2d at 40. As a result, "a District Court must accept the [hearing officer's] credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." J.N., 677 F.Supp.2d at 322 (quoting Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004)) (emphasis omitted). Beyond Ms. Moradnejad's self-serving testimony that she was not in agreement with the April 2012, and January 2013 IEPs, Plaintiffs offer no evidence to support this claim. Because there is no evidence in the administrative record beyond Ms. Moradnejad's own testimony that can support a finding that Ms. Moradnejad did not consent to the April 12, 2012, and January 28, 2013, IEPs when they were adopted, the undersigned defers to the findings of the hearing officer.

Moreover, the ultimate result would not change even if the Court overturned the hearing officer's credibility determination. Plaintiffs' contention that the hearing officer's decision was based "in large part" on her assessment of Ms. Moradnejad's credibility is not correct. Pl. Mot. at 11. The hearing officer evaluated the entire body of evidence in the record, including testimony from numerous teachers and educational experts, and the results of many evaluations and IEP progress reports. This evidence would form a sufficient basis for the hearing officer's conclusions even if one believed Ms. Moradnejad's testimony about her lack of consent to the IEPs. In other words, the hearing officer's credibility finding concerning Ms. Moradnejad was only a small fraction of the evidence supporting her conclusions. See A.M. v. Dist. of Columbia, 933 F.Supp.2d 193, 203 (D.D.C.2013) (concluding that even if the hearing officer made an incorrect credibility determination, "the credibility finding was not crucial to the outcome, and it does not provide a basis for overturning the hearing officer's decision on the merits"). The hearing officer provided a detailed and thorough examination of the record presented to her, and on this ground, the undersigned would uphold her decision.

3. Ms. Moradnejad Knew That a Self-Contained Program was a Placement Option She Could Have Requested for P.X.

Finally, Plaintiffs assert that Ms. Moradnejad did not know that a full-time, self-contained program was an option she could have requested for P.X. during the April 2012 and January 2013 IEP meetings. Compl. at 9; Pl. Mot. at 13. Ms. Moradnejad testified that she "didn't understand what [self-contained] meant" and that it "never came up" when discussing P.X.'s kindergarten services. AR 928. The hearing officer again found Ms. Moradnejad's assertion to be not credible, relying on the fact that Ms. Moradnejad was heavily involved in P.X.'s education and spoke with educators on an almost daily basis. Id. at 14. Furthermore, P.X. "had previously been placed in a self-contained classroom" prior to pre-kindergarten "and a self-contained classroom existed right next door to P.X.'s kindergarten class." Id.

As before, the undersigned must defer to the hearing officer's credibility determination unless "the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." J.N., 677 F.Supp.2d at 322. Having thoroughly reviewed the administrative record, the undersigned finds that the only evidence supporting Plaintiffs' claim is Ms. Moradnejad's own testimony. Without extrinsic evidence to support the claim, the undersigned must defer to the findings of the hearing officer. And, as before, the weight of evidence in the record supports the hearing officer's ultimate conclusion even if one discards this credibility determination. A.M., 933 F.Supp.2d at 203.

## CONCLUSION

For the reasons stated above, the undersigned recommends that the Court deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment.

\* \* \* \* \*

The parties are hereby advised that failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Date: March 16, 2016